IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,184

ZIAD K. KHALIL-ALSALAAMI,
*Appellant,*

v.

STATE OF KANSAS,
*Appellee.*

SYLLABUS BY THE COURT

1.

The Sixth Amendment to the United States Constitution guarantees that in all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his or her defense. This right, deemed fundamental and essential to a fair trial, applies to the states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

2.

The Sixth Amendment right to counsel requires more than the presence of an attorney; it guarantees the right to effective assistance from the attorney. The purpose of the effective assistance guarantee is simply to ensure that criminal defendants receive a fair trial.

3.

Claims alleging a violation of this Sixth Amendment right to effective assistance of counsel are analyzed under the well-established, two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by our court in *Chamberlain v. State*, 236 Kan. 650, 694 P.2d 468 (1985). Under

1

the first prong, a defendant must demonstrate that counsel's performance was deficient. If so, the court moves to the second prong and determines whether there is a reasonable probability that, without counsel's unprofessional errors, the result would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court that hears an ineffective assistance of counsel claim must consider the totality of the evidence before the judge or jury.

4.

Judicial scrutiny of counsel's performance must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

5.

Where the district court conducts a full evidentiary hearing and makes findings of fact and conclusions of law in ruling on a K.S.A. 60-1507 motion, we apply the mixed standard of review customarily applied in similar civil proceedings. Under this standard, an appellate court must determine whether the district court's factual findings are supported by substantial competent evidence and whether those findings are sufficient to support the district court's conclusions of law. Ultimately, the district court's conclusions of law and its decision to grant or deny the K.S.A. 60-1507 motion are reviewed using a de novo standard.

6.

Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved.

7.

In reviewing a district court's factual findings for substantial competent evidence, we cannot reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.

8.

One of the most basic of the rights guaranteed by the Confrontation Clause of the Sixth Amendment is the accused's right to be present in the courtroom at every critical stage of his or her trial. The right to be present encompasses more than a defendant's mere physical appearance at critical stages. It assumes the defendant will be informed about the proceedings so he or she can assist in the defense.

9.

Criminal defendants are denied due process when they are unable to understand the proceedings due to a language difficulty. Therefore, defendants' due process right to be present includes a right to have trial proceedings translated into a language they understand so that they can participate effectively in the defense.

10.

To establish a Sixth Amendment claim of ineffective assistance of counsel based on counsel's failure to pursue and litigate a motion to suppress evidence to its conclusion, a defendant must show:  (1) a suppression motion would have been meritorious, i.e., was likely to be granted; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a

reasonable probability that the verdict would have been different absent the excludable evidence.

11.

K.S.A. 75-4351 does not create new constitutional protections. Instead, the statute and its related provisions reflect the Legislature's intent to create a process through which public officials shall appoint interpreters for eligible persons to ensure the quality of translation does not fall below existing constitutional thresholds.

12.

Under the Fifth Amendment to the United States Constitution, statements stemming from custodial interrogation must be excluded unless the State demonstrates it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination. The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation.

13.

If a defendant voluntarily waives *Miranda* rights, any subsequent inculpatory statement must still be voluntarily given. A trial court looks at the totality of the circumstances surrounding the statement and determines its voluntariness by considering the following nonexclusive list of factors:  (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.

14.

When scientific, technical, or specialized knowledge helps the jury understand the evidence or determine an issue of fact, Kansas law permits a witness who is qualified as

4

an expert by knowledge, skill, experience, training, or education to testify thereto in the form of an opinion or otherwise, provided the opinion is reliable.

15.

K.S.A. 60-456 does not permit expert opinion testimony on subjects beyond the witness' qualification.

16.

A prosecutor may not seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his or her failure to have told the story after receiving *Miranda* warnings at the time of his or her arrest. However, a prosecutor may pose questions that can be reasonably interpreted as an attempt to impeach the defendant's trial testimony by way of his or her prior inconsistent statements to the officers.

17.

Kansas law favors the admission of otherwise relevant evidence, and the exclusion of relevant evidence is an extraordinary remedy that should be used sparingly.

18.

Relevant evidence means evidence having any tendency in reason to prove any material fact.

19.

Any party, for purposes of impairing or supporting the credibility of a witness, may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility. However, evidence of specific instances of a witness' conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible.

20.

The decisions of whether and how to conduct cross-examination are matters of trial strategy, provided defense counsel has made an informed decision.

21.

Under the facts of this case, counsel's failure to cross-examine a witness regarding the terms of a plea agreement is not deficient performance where the relevant information came into evidence through other witnesses.

22.

When analyzing a claim of cumulative error, the court examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence. No prejudicial error may be found under this rule if the evidence against the defendant is overwhelming.

23.

To prevail on a claim of ineffective assistance of appellate counsel, a defendant must show that (1) counsel's performance, based upon the totality of the circumstances, was deficient in that it fell below an objective standard of reasonableness; and (2) defendant was prejudiced to the extent there is a reasonable probability that, but for counsel's deficient performance, the appeal would have been successful.

Review of the judgment of the Court of Appeals in 54 Kan. App. 2d 235, 399 P.3d 264 (2017). Appeal from Riley District Court; JOHN F. BOSCH, judge. Original opinion filed September 11, 2020 in 312 Kan. 62, 472 P.3d 60 (2020). Opinion on rehearing filed May 14, 2021. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

6

*Richard Ney*, of Ney, Adams & Miller, of Wichita, argued the cause, and *David L. Miller*, of the same firm, was with him on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Bethany C. Fields*, deputy county attorney, *Barry K. Disney*, senior deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt,* attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

WALL, J.:  A jury convicted Ziad K. Khalil-Alsalaami of two counts of aggravated criminal sodomy in violation of K.S.A. 21-3506 and acquitted him of one count of rape charged under K.S.A. 21-3502(a)(2). After exhausting his direct appeal, Khalil-Alsalaami filed a K.S.A. 60-1507 motion seeking a new trial based on allegations of ineffective assistance of both his trial and appellate counsel. The district court denied his motion, but the Court of Appeals reversed and remanded the matter. We initially issued an opinion affirming the Court of Appeals' decision. However, before the mandate issued, we granted the State's motion for rehearing, and the parties reargued the matter to the court.

Khalil-Alsalaami presented substantial evidence in support of his requested relief. Yet, this evidence was by no means uncontroverted, as the State also presented testimony and exhibits in opposition to Khalil-Alsalaami's claims during the K.S.A. 60-1507 evidentiary hearing. Ultimately, the district court weighed this competing evidence and resolved conflicting testimony in favor of the State.

We have long observed:

"Where findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the supreme court's power begins and ends with the determination whether there is any competent substantial evidence to support them, and where findings are so supported they are accepted as true and will not be disturbed on

7

appeal, and in such a case it is of no consequence that there may have been much contradictory evidence adduced at the trial which, if believed by the trial court, would have compelled entirely different findings of fact and an entirely different judgment." *Fine v. Neale Construction Co.*, 186 Kan. 537, Syl. ¶ 1, 352 P.2d 404 (1960).

And, in such a case, "'the court of appeals may not reverse [the district court] even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *June Medical Services L. L. C. v. Russo*, 591 U.S. ___, 140 S. Ct. 2103, 2121, 207 L. Ed. 2d 566 (2020); see *Ratzlaff v. Friedeman Service Store*, 195 Kan. 548, 550, 407 P.2d 513 (1965) (when reviewing for substantial competent evidence, the appellate court's duty is to ascertain whether the record contains any evidence which on any theory of credence, or want of credence, would justify the district court findings and conclusions of fact; "'it is of no consequence that if we had been the triers of fact we might have reached a different conclusion than the trial court respecting the question involved'").

In adhering to this controlling standard of review and the legal framework applied to Khalil-Alsalaami's claims, we reverse the decision of the Court of Appeals and affirm the district court's denial of Khalil-Alsalaami's motion for relief under K.S.A. 60-1507.

FACTS AND PROCEDURAL BACKGROUND

Khalil-Alsalaami is originally from Iraq and worked there as a translator for the United States Army before immigrating to the United States in 2009. In May 2010, Khalil-Alsalaami and his roommates threw a party at their Manhattan, Kansas, home. C.J. attended the party with several of her friends. Several days later, C.J. and her mother reported to the Riley County Police Department that C.J. was sexually assaulted at the party. C.J. alleged that Khalil-Alsalaami vaginally raped her and orally and anally sodomized her. C.J. was 13 years old at the time of this incident.

*Investigation and Pretrial Proceedings*

The Riley County Police Department investigated the allegations, and Khalil-Alsalaami agreed to go to the police station for an interview. At the police station, Detective Ryan Runyan and Detective Sonia Gregoire interviewed Khalil-Alsalaami. Khalil-Alsalaami's primary language is Arabic, but no translator was present for the interview. Khalil-Alsalaami informed detectives he could speak, but not read, English. Detective Runyan advised Khalil-Alsalaami of his *Miranda* rights orally, reading from the department's waiver form. Detective Runyan explained:

"DET. RYAN RUNYAN: Okay. And in America, any time we talk to somebody, we have something called the Miranda Rights.

"ZIAD KHALIL-ALSALAAMI: Uh-huh.

"DET. RYAN RUNYAN: You ever talk about that when you were over in Iraq with the Army?

"ZIAD KHALIL-ALSALAAMI: No. What?

"DET. RYAN RUNYAN: What it is, we will ask you some questions. So before I ask you any questions, you must understand what your rights are. I mean, you don't have to answer any questions if you don't want to. But this is what we call Miranda Rights.

"ZAID KHALIL-ALSALAAMI: Okay, sir.

"DET. RYAN RUNYAN: I know you said you can't read English but you understand it very well. You took English in grade school and high school?

"ZIAD KHALIL-ALSALAAMI: High school.

"DET. RYAN RUNYAN: I guess you were employed by the Army to interpret?

"ZAID KHALIL-ALSALAAMI: Uh-huh.

"DET. RYAN RUNYAN: For the soldiers?

"ZIAD KHALIL-ALSALAAMI: Yeah.

"DET. RYAN RUNYAN: All right. So what it is, is you have the right to remain silent. Which means you don't have to talk if you don't want to. Okay. That's one of your rights. And anything you say can and will be used against you in a court of law. So I'm

going to have some questions for you. I just want you to be honest with me and just remember that when you answer the questions it can be used against you. And you have the right to talk to a lawyer and have him here present with you while you're being questioned. You know what a lawyer is?

"ZIAD KHALIL-ALSALAAMI:  I don't know.

"DET. RYAN RUNYAN:  What do they call a lawyer in Iraq?

"ZIAD KHALIL-ALSALAAMI:  Mohami. Mohami.

"DET. RYAN RUNYAN:  Mohami, okay. And then you—if you cannot afford to hire a lawyer or a mohami, one will be appointed to represent you before any questions if you wish. You understand all of these rights, sir?

"ZIAD KHALIL-ALSALAAMI:  Yes.

"DET. RYAN RUNYAN:  So then you can decide at any time to exercise these rights. You say, Detective Runyan, I don't want to talk anymore. You can do that at any time. It's not a big deal. And not answer any questions or make statements if you don't want to. If you don't want to answer any questions or make any statements you don't have to. What I'm looking for is cooperation. And to get your side of the story as far as what happened—

"ZIAD KHALIL-ALSALAAMI:  Uh-huh.

"DET. RYAN RUNYAN:  —with this Roger and his friends when they came over on Saturday.

"ZIAD KHALIL-ALSALAAMI:  Okay.

"DET. RYAN RUNYAN:  And maybe you don't know all the details or maybe you have some information that might be helpful. But that's what I'm looking for.

"ZIAD KHALIL-ALSALAAMI:  Okay.

"DET. RYAN RUNYAN:  So you understand all that?

"ZIAD KHALIL-ALSALAAMI:  You want me to talk about—

"DET. RYAN RUNYAN:  Would you want to answer my questions?

"ZIAD KHALIL-ALSALAAMI:  Uh-huh."

Following this advisement, Detective Runyan began questioning Khalil-Alsalaami about the incident. Detective Runyan did not initially disclose C.J.'s age. Instead, his questions

focused on whether C.J. had consented to sex. Khalil-Alsalaami argues this method of questioning is a "minimization" technique.

Khalil-Alsalaami admitted to having consensual oral and anal sex, but not vaginal sex, with C.J. on the night of the party. The detectives then arrested Khalil-Alsalaami and charged him with two counts of aggravated criminal sodomy (related to the allegations of oral and anal sex with C.J.) and one count of rape (related to the State's allegations of vaginal penetration).

Khalil-Alsalaami was initially represented by defense attorney Stephen Freed. Before trial, the State filed a motion pursuant to *Jackson v. Denno,* 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), to secure a ruling on the admissibility of Khalil-Alsalaami's confession. While the State's *Jackson v. Denno* motion was pending, Khalil-Alsalaami engaged new trial counsel Barry Clark and Jeremy Platt. After conducting an initial investigation, Clark and Platt decided not to contest the admissibility of Khalil-Alsalaami's confession and entered a stipulation to its voluntariness. This stipulation was memorialized in a journal entry executed by the district judge.

*The Jury Trial*

The case proceeded to a three-day jury trial starting on April 19, 2011. Clark served as lead defense counsel, and Platt acted as second chair. While Khalil-Alsalaami had used an interpreter at preliminary hearing, arraignment, and during the partial *Jackson v. Denno* hearing, he did not use one during the jury trial.

The State called the victim, C.J.; along with J.E. and R.E., who both attended the party with her. Additionally, the State called Amanda Nall, a Sexual Assault Nurse Examiner (SANE) who examined C.J. several days after the alleged assault; Brandy Bertrand, a forensic biologist from the Kansas Bureau of Investigation who reported on

11

the results of DNA testing; and the investigating detectives, among others. As part of its case-in-chief, the State also introduced a video recording of Khalil-Alsalaami's interview with detectives, which included his confession.

C.J. testified that she went to Khalil-Alsalaami's party on the evening of May 1, 2010, with her friend J.E., his brother R.E., and Roger Safford. C.J. testified that during the party, Khalil-Alsalaami required her to perform oral and anal sex while the two were together in his bedroom. She said Khalil-Alsalaami ejaculated on her stomach and the bed during this encounter.

J.E. testified that Safford had brokered a deal for Khalil-Alsalaami to have sex with C.J. in exchange for money. Both J.E. and R.E. testified they saw Khalil-Alsalaami enter his bedroom with C.J. and, shortly thereafter, C.J. told them Khalil-Alsalaami had made her perform oral and anal sex.

Nall performed a sexual assault examination on May 4, 2010. During the exam, C.J. said she had been sexually assaulted around midnight on May 2. C.J. described her assailant as a Middle Eastern man who vaginally penetrated her with his fingers and penis and orally penetrated her with his penis. Nall said C.J. did not mention anal penetration. C.J. reported the man ejaculated some in her mouth and some on her stomach. But C.J. also said she had showered and changed clothes between the attack and the exam. Nall did not observe any obvious physical injuries. On further questioning, Nall opined that the lack of obvious physical injury was consistent with sexual assault because "[t]he majority of sexual assault[s] don't have any injuries."

Bertrand testified to the results of the State's DNA testing. She tested two samples containing seminal fluid found on the shorts C.J. wore on the night of the assault—one sample was found on the drawstring and the other on the outside portion of the shorts. Bertrand developed DNA profiles from these samples and found they were a "mixture,"

12

meaning there was "more than one person contributing to the DNA profile." Bertrand confirmed these profiles contained "a mixture consistent with at least two individuals." She compared the known DNA samples taken from Khalil-Alsalaami, Safford, and C.J. to the unknown DNA profiles from C.J.'s shorts. She determined the DNA profiles from the shorts matched the known DNA profiles of Khalil-Alsalaami and C.J. Bertrand excluded Safford as a possible contributor.

Khalil-Alsalaami took the stand in his own defense. To challenge the reliability of his confession, the defense claimed Khalil-Alsalaami was "tricked" into confessing falsely due to Detective Runyan's purported use of a minimization technique during questioning. Khalil-Alsalaami explained that he believed C.J. was at least 17 years old. And during the interview with detectives, Detective Runyan led him to believe the investigation was focused on consent, not C.J.'s age. Thus, when he told detectives he had oral and anal sex with her, Khalil-Alsalaami did not think he was admitting to a crime.

Khalil-Alsalaami denied all the charges and testified he would never have sex with a 13-year-old or pay for sex with another woman, in part, because of the shame and stigma attached to such conduct in his culture.

Khalil-Alsalaami also offered testimony to address the results of the State's DNA testing. He suggested his DNA transferred to C.J. when she sat on his bed with another individual on the night of the party—the DNA "transference" theory. Khalil-Alsalaami disclosed that while his wife remained in Iraq, he had an affair with a woman, J.B. Khalil-Alsalaami testified that he had sex with J.B. in his bed before the party began. Later that night, he said C.J., Safford, and J.E. had gone into his bedroom and closed the door. Khalil-Alsalaami claimed he then went to his bedroom, opened the door, and saw C.J. on his bed, half-naked with only her shirt on, sitting next to Safford and J.E. Khalil-Alsalaami proceeded to kick them and others out of his house, bringing an end to the party. In sum, under the DNA transference theory, the defense claimed Khalil-

13

Alsalaami's DNA was on his bed because he had sex with J.B. before the party started, and his DNA transferred to C.J.'s clothing when she was on the bed with Safford and J.E. later that night.

During cross-examination, the State attacked Khalil-Alsalaami's false confession theory by introducing the journal entry from the *Jackson v. Denno* hearing, which included the following stipulation: "the parties announce they are ready to proceed and that the Defendant stipulates that his statements to law enforcement were knowing and voluntarily given and he was not under any compulsion or no threats or promises were made to him." The State also questioned Khalil-Alsalaami about his affair with J.B. and whether he told his wife about it.

J.B. also testified for the defense. She confirmed that before the party began, she and Khalil-Alsalaami had sex in his bed. But J.B. said Khalil-Alsalaami wore a condom and did not ejaculate on the bed. She testified Khalil-Alsalaami still had the condom on as he walked out of the bedroom after they had sex.

During the State's closing the prosecutor highlighted the DNA evidence, explaining:

> "But at the end of the day you have two—there was a mixed D.N.A. and you have two
> people contributing that mixed D.N.A.—C.J. and the defendant. There wasn't three
> people contributing to that D.N.A. sample, there was two—C.J. and [Khalil-Alsalaami]."

During the State's rebuttal, the prosecutor discussed the application of the DNA evidence to the defense's transference theory, arguing:

> "If she got seminal fluid on the inside of her shorts from the defendant having sex in his
> bed with [J.B.] during foreplay or, you know, foreplay and pre-ejaculate then why wasn't
> [J.B.'s] D.N.A. mixed in there? There was no unknown D.N.A. in the mix. It was [Khalil-

14

Alsalaami's] seminal—[Khalil-Alsalaami's] D.N.A. . . . a mixture of two people, not three people. . . . Two people: The defendant and C.J."

The prosecutor also argued in closing that Khalil-Alsalaami's stipulation to the voluntariness of his confession undermined his claim that Detective Runyan had tricked him into confessing falsely.

Ultimately, the jury convicted Khalil-Alsalaami of the two counts of aggravated criminal sodomy corresponding to the anal and oral sex he admitted to in the interview with detectives, but it acquitted him of the rape charge corresponding to the allegations of vaginal penetration that he denied in the interview. The district judge sentenced Khalil-Alsalaami to two hard 25 life sentences for the aggravated criminal sodomy convictions and ordered these sentences to run concurrent.

*Direct Appeal*

Clark represented Khalil-Alsalaami on his direct appeal. The Court of Appeals affirmed Khalil-Alsalaami's convictions. *State v. Khalil-Alsalaami*, No. 106,610, 2012 WL 5869581, at *8 (Kan. App. 2012) (unpublished opinion).

*Collateral Proceedings*

In 2014, represented by new counsel, Khalil-Alsalaami filed the K.S.A. 60-1507 motion giving rise to this appeal. Khalil-Alsalaami argued that numerous instances of ineffective assistance by trial and appellate counsel denied him a fair trial. Specifically, he alleged violations of his Sixth Amendment right to counsel based on: (1) trial counsel's failure to secure an interpreter during trial; (2) appellate counsel's failure to raise this issue on direct appeal; (3) trial counsel's failure to challenge the voluntariness of Khalil-Alsalaami's confession; (4) trial counsel's stipulation to the voluntariness of that

15

confession; (5) trial counsel's failure to object to Nall's expert opinion that C.J. had been sexually assaulted; (6) trial counsel's failure to object to the State's questions about Khalil-Alsalaami's post-arrest silence and his affair; (7) trial counsel's failure to impeach J.E. based on the terms of his plea agreement with the State; (8) trial counsel's failure to object to the prosecutor's misstatement of the DNA evidence in closing; (9) appellate counsel's failure to raise the prosecutorial error issue on direct appeal; and (10) trial counsel's failure to adequately investigate and prepare the case. Khalil-Alsalaami also alleged the cumulative effect of these errors violated his Sixth Amendment right to counsel and prejudiced his defense.

District Judge John Bosch, who did not serve as the presiding judge at the jury trial, conducted a two-day evidentiary hearing on the motion from June 30 to July 1, 2015. At the evidentiary hearing, the parties called seven witnesses, including: (1) Clark; (2) Platt; (3) Dr. Robin Cabral, a language comprehension expert who offered opinion testimony on Khalil-Alsalaami's English proficiency; (4) the video deposition of Captain Robert Nussbaumer, who used Khalil-Alsalaami as an interpreter during Captain Nussbaumer's deployment to Iraq; (5) Dr. Imad Khamis, who had served as Khalil-Alsalaami's interpreter pretrial; (6) Shawnel Neal, an employee of the Kansas Department of Revenue, who testified to Khalil-Alsalaami's driver's license testing and language accommodations; and (7) Khalil-Alsalaami.

Before ruling on the motion, Judge Bosch ordered the State to file a memorandum response to Khalil-Alsalaami's prehearing brief in support of his K.S.A. 60-1507 motion and authorized Khalil-Alsalaami to file a memorandum response to the State's filing. The State filed its memorandum on September 28, 2015. Khalil-Alsalaami filed his supplemental memorandum and response on October 16, 2015.

On January 19, 2016, the district judge denied the K.S.A. 60-1507 motion in a 50-page order detailing its findings of fact and conclusions of law. The order also adopted

16

and incorporated by reference portions of the State's memorandum response. Other evidence, findings, and conclusions relevant to the resolution of the ineffective assistance of counsel claims raised in this appeal are discussed in the "Analysis" section below.

Khalil-Alsalaami appealed from the district judge's order. The Court of Appeals reversed and remanded the matter to the district court. The Court of Appeals held that trial counsel provided ineffective assistance by: (1) failing to request an interpreter for defendant at trial; (2) failing to file a motion to suppress the confession; (3) stipulating to the voluntariness of the confession; (4) failing to object to Nall's opinion testimony; and (5) failing to object to the prosecutor's misstatements of the DNA evidence during closing arguments. The panel also held the cumulative impact of these errors, coupled with other instances of deficient performance that were not prejudicial in isolation, denied Khalil-Alsalaami the right to a fair trial.

We granted the State's petition for review and issued an opinion affirming the Court of Appeals' decision in September 2020 based solely on Khalil-Alsalaami's Sixth Amendment claim related to the voluntariness of his confession. *Khalil-Alsalaami v. State*, 312 Kan. 62, 472 P.3d 60 (2020). Before the mandate issued, we granted the State's motion for rehearing, and the parties reargued the matter on December 18, 2020. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review.).

ANALYSIS

The State's motion for reconsideration and the parties' subsequent briefing and argument require us to explore anew the Court of Appeals' resolution of Khalil-Alsalaami's claims of ineffective assistance of counsel.

*Legal Framework and Standard of Review*

While Khalil-Alsalaami raised numerous issues, nearly every claim was advanced under the Sixth Amendment theory of ineffective assistance of counsel. The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right, deemed fundamental and essential to a fair trial, applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 341-45, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). The right to counsel "requires more than the presence of an attorney; it guarantees the right to effective assistance from the attorney." *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012). We have acknowledged that "[t]he purpose of the effective assistance guarantee 'is simply to ensure that criminal defendants receive a fair trial.'" 296 Kan. at 174 (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]).

*Legal Framework*

Claims alleging a violation of this Sixth Amendment right to effective assistance of counsel are analyzed under the well-established, two-prong test articulated in *Strickland* and adopted by our court in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985):

> "*Strickland* established a two-prong test for determining if a criminal defendant's Sixth Amendment right to effective assistance of counsel has been violated by an attorney's performance. 466 U.S. at 687-96. Kansas courts adopted this test in *Chamberlain*, 236 Kan. at 656-57. Under the first prong, a defendant must demonstrate that counsel's performance was deficient. 236 Kan. at 656. If so, the court moves to the second prong and determines whether there is a reasonable probability that, without counsel's

unprofessional errors, the result would have been different. *Strickland*, 466 U.S. at 694."
*State v. Betancourt*, 301 Kan. 282, 306, 342 P.3d 916 (2015).

To establish deficient performance under the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Courts must remain mindful that their scrutiny of an attorney's past performance is highly deferential and viewed contextually, free from the distorting effects of hindsight:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citations omitted.]" 466 U.S. at 689.

Under *Strickland*'s second prong, defendants must show the deficient performance of counsel was prejudicial. To do so, defendant must establish with reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence. *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.'" 294 Kan. at 838.

19

*Standard of Review*

The procedural posture of a K.S.A. 60-1507 motion also affects the nature and scope of our review. Where, as here, the district court conducts a full evidentiary hearing and makes findings of fact and conclusions of law in ruling on the motion, we apply the mixed standard of review customarily applied in similar civil proceedings. *Balbirnie v. State*, 311 Kan. 893, 897-98, 468 P.3d 334 (2020).

> "Under this standard, an appellate court must determine whether the district court's factual findings are supported by substantial competent evidence and whether those findings are sufficient to support the district court's conclusions of law. Ultimately, the district court's conclusions of law and its decision to grant or deny the 60-1507 motion are reviewed using a de novo standard. [Citations omitted.]" *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007).

"'Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved.'" *State v. Sanders*, 310 Kan. 279, 294, 445 P.3d 1144 (2019). As highlighted in the introduction, in reviewing a district court's factual findings for substantial competent evidence, appellate courts do not "'"reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence."'" 310 Kan. at 294.

For purposes of convenience and organization, we first apply this legal framework and standard of review to the claims of ineffective assistance related to trial counsel's performance before trial; then, we proceed to those claims allegedly arising during trial; next, we address the claims related to the performance of appellate counsel; and finally, we review the cumulative error claim.

*Trial Counsel's Failure to Secure an Interpreter for the Jury Trial Did Not Constitute Ineffective Assistance of Counsel*

Khalil-Alsalaami claims his trial counsel were ineffective because they failed to secure an interpreter for him at the jury trial and did not properly advise him of his statutory right to these services. He contends this deficient performance deprived him of the Sixth Amendment right to be present and confront witnesses at trial. Finally, he argues the nature of such error requires the court to presume the existence of prejudice.

Khalil-Alsalaami's challenge under the interpreter statute raises two distinct issues: (1) whether trial counsel's failure to secure an interpreter constituted ineffective assistance that impaired his ability to be present and meaningfully participate in his own defense; and (2) whether trial counsel adequately advised Khalil-Alsalaami of his statutory right to an interpreter and properly secured a waiver of these rights. We address each issue in turn.

*Trial Counsel's Decision to Proceed Without an Interpreter Did Not Violate Khalil-Alsalaami's Right to Be Present*

As to the first issue, we have recognized the constitutional right to be present at all critical stages of trial is one of the most fundamental rights guaranteed to the accused:

"One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his or her trial. *Lewis v. United States*, 146 U.S. 370, 373, 13 S. Ct. 136, 36 L. Ed. 1011 (1892). A defendant's constitutional right to be present during criminal proceedings stems from the Sixth Amendment right to confront witnesses and the due process right to attend critical stages of a criminal proceeding in which the defendant is not actually confronting witnesses or evidence against him or her. See *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987); *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985). The due process right exists to the extent that a fair and just hearing

21

would be thwarted by the defendant's absence, and to that extent only. *Gagnon*, 470 U.S. at 526; *Snyder v. Massachusetts*, 291 U.S. 97, 107-08, 54 S. Ct. 330, 78 L. Ed. 674 (1934). In other words, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if the defendant's presence would contribute to the fairness of the procedure. *Stincer*, 482 U.S. at 745." *State v. Calderon*, 270 Kan. 241, 245, 13 P.3d 871 (2000).

Moreover, the right to be "present" encompasses more than a defendant's mere physical appearance at critical stages. It assumes the defendant "will be informed about the proceedings so he or she can assist in the defense." 270 Kan. at 245. Therefore, "[a] defendant's right to be present includes a right to have trial proceedings translated into a language that he or she understands so that he or she can participate effectively in his or her own defense." 270 Kan. at 245. Criminal defendants are denied due process when they are "unable to understand the proceedings due to a language difficulty." *Mendoza v. United States*, 755 F.3d 821, 827 (7th Cir. 2014).

Khalil-Alsalaami relies primarily on *Calderon* to support his claim. There, the defendant relied on an interpreter throughout the presentation of trial evidence. But before closing argument, the district court instructed the translator not to interpret for the defendant while counsel made their arguments to the jury. *Calderon* held the district court's order violated defendant's due process right to be meaningfully present. *Calderon*, 270 Kan. at 253.

In *Calderon*, there was "no dispute" defendant required an interpreter. 270 Kan. at 246. Here, that issue was hotly contested by the parties at the K.S.A. 60-1507 hearing. In ruling on the motion, the district judge found Khalil-Alsalaami was proficient in English and meaningfully participated in his defense without the use of an interpreter. Additionally, the district judge found trial counsel, in consultation with Khalil-Alsalaami, made a "tactical decision" to proceed to trial without an interpreter. The district judge found this decision was "tactical" because it was motivated by trial counsel's concern that

22

jurors would construe Khalil-Alsalaami's use of an interpreter as an attempt to hide behind a language barrier that did not exist. Based on these findings, the district judge concluded that trial counsel's performance was objectively reasonable.

To resolve this issue under the applicable standard of review, we must first analyze the K.S.A. 60-1507 record to determine whether substantial competent evidence supports the district court findings. If so, we must then decide whether these findings provide adequate support for its legal conclusion.

As to the sufficiency of the evidence supporting the district judge's findings, the parties presented competing evidence at the motion hearing regarding Khalil-Alsalaami's English proficiency and his level of participation at trial. Khalil-Alsalaami testified he did not understand much at trial, and Dr. Cabral opined that Khalil-Alsalaami would not have understood considerable portions of these proceedings. Dr. Khamis, who provided interpreter services to Khalil-Alsalaami pre-trial, likewise opined that Khalil-Alsalaami's comprehension of the English language was insufficient to proceed to trial without an interpreter.

However, trial counsel Clark and Platt testified they had numerous conversations with Khalil-Alsalaami throughout the representation, and they communicated effectively with him in English, without use of an interpreter. According to Clark, he met with Khalil-Alsalaami on several occasions at the jail before trial and never had difficulty communicating with his client. During these meetings, Clark discussed trial strategy, witness selection, and the concept of jury nullification with Khalil-Alsalaami. Clark had no doubt Khalil-Alsalaami understood the subject matter. For example, after explaining the concept of jury nullification, Khalil-Alsalaami actively discussed potential witnesses and evidence that could bolster trial themes designed to encourage jurors to exercise this power of nullification. Khalil-Alsalaami also actively participated in discussions about

23

the defense investigation and played a critical role in developing witnesses and potential defenses.

Trial counsel made similar observations regarding Khalil-Alsalaami's comprehension and participation during the jury trial. Khalil-Alsalaami never told Clark he had any difficulty comprehending the trial proceedings, and Clark observed that Khalil-Alsalaami had been "[c]learly" tracking what was going on each day in court. Platt likewise confirmed Khalil-Alsalaami never communicated a need for an interpreter. Nor did Platt ever feel one was needed. Trial counsel testified that if Khalil-Alsalaami did not understand a word or concept during trial, then he asked for and received clarification. Part of Platt's duties as second chair was to address Khalil-Alsalaami's comments and questions. Platt testified that Khalil-Alsalaami asked contextual questions related to the subject matter of the witnesses' testimony or contemporaneous events occurring at trial. This suggested to Platt that Khalil-Alsalaami was fully tracking and actively participating. Trial counsel also met with Khalil-Alsalaami during breaks and in the evenings after trial to discuss developments from the day's proceeding. Clark testified Khalil-Alsalaami effectively participated in these discussions without an interpreter. Platt was confident Khalil-Alsalaami comprehended the subject matter and remained fully apprised of key developments and defense strategies after these meetings.

Other circumstantial evidence from the K.S.A. 60-1507 hearing lends credence to this testimony. For example, Khalil-Alsalaami testified that he studied English in high school. Captain Nussbaumer testified he had no difficulty communicating in English with Khalil-Alsalaami when defendant served as an interpreter for coalition forces in Iraq. Employment records created before Khalil-Alsalaami's arrest indicated he communicated effectively with coworkers. And the recording of the interview itself demonstrated Khalil-Alsalaami's English proficiency in action.

24

This evidence was further corroborated by several uncontroverted district court findings, including: (1) Khalil-Alsalaami worked as a U.S. Army interpreter from 2004 to 2009; (2) he came to the U.S. in April 2009 and worked more than 8 months at Fort Riley, training U.S. soldiers how to deal with his culture; and (3) he had lived in the U.S. for 14 months at the time of his arrest and for 2 years at the time of his trial.

A reasonable person could conclude that trial counsel's testimony, along with the other supporting circumstantial evidence and uncontroverted district court findings, is sufficient to support the conclusion that Khalil-Alsalaami was sufficiently proficient in English to understand the trial proceedings and actively participate in his defense without the assistance of an interpreter. In other words, substantial competent evidence supported the district court findings. See *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009) (substantial competent evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion).

In reaching the opposite conclusion, the Court of Appeals implicitly credits the testimony of Khalil-Alsalaami, Dr. Khamis, and Dr. Cabral over the State's evidence. Granted, Dr. Cabral's expert testimony appears persuasive from the transcript and in isolation. Had the district court adopted this testimony, it would have supported a different outcome. However, Dr. Cabral's expert testimony is not entitled to special deference—it is to be considered like other testimony and entitled to such weight and credit as the finder of fact deems appropriate. *City of Wichita v. Sealpak Co*., 279 Kan. 799, 807, 112 P.3d 125 (2005) (explaining this rationale, as incorporated into PIK instruction addressing treatment of expert opinion testimony). The State challenged Dr. Cabral's opinions through cross-examination and controverted her testimony through the substantial competent evidence highlighted above. The State's evidence created a disputed question of fact. The district judge fulfilled his fact-finding duty by weighing the competing evidence and resolving conflicting testimony in favor of the State.

25

As we have emphasized, in reviewing the district court's ruling on a K.S.A. 60-1507 motion, we do not reweigh the evidence, resolve conflicts in evidence, or make credibility determinations. *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018). These functions fall within the exclusive purview of the district court as the finder of fact. On review, the appellate court's duty is limited to deciding whether the district court findings, viewed in the light most favorable to the prevailing party, are supported by substantial competent evidence. See *In re Adoption of J.M.D.*, 293 Kan. 153, 171, 260 P.3d 1196 (2011) (in applying substantial competent evidence review for stepparent adoption, "appellate court should review the facts of the case in the light most favorable to the prevailing party below to ascertain whether the trial court's decision is properly supported by substantial competent evidence"); see also *Drach v. Bruce*, 281 Kan. 1058, 1063, 136 P.3d 390 (2006) (applying substantial competent evidence review to district court findings on appeal from denial of K.S.A. 60-1507 motion after full evidentiary hearing). The Court of Appeals' holding is legally erroneous because it neither accounts for the substantial competent evidence supporting the district court findings, nor adheres to the controlling standard limiting our scope of review on appeal.

The Court of Appeals also found it significant that trial counsel did not conduct language proficiency testing as part of its investigation before deciding to proceed to trial without an interpreter. *Khalil-Alsalaami*, 54 Kan. App. 2d at 243-44. However, Khalil-Alsalaami offered no evidence establishing such testing as the standard of care in 2011 for reasonable defense attorneys representing individuals whose primary language is not English. The Court of Appeals also failed to credit other substantial competent evidence supporting the reasonableness of defense counsel's investigation. Clark testified he had over 30 years' experience practicing criminal law and had litigated "[h]undreds, perhaps thousands" of trials. During this time, Clark had represented many defendants for whom English was not their primary language. And, when these clients lacked proficiency in English, he secured the appointment of an interpreter. Based on his experience, his interactions with the client, and his review of the recorded interview, Clark determined

26

Khalil-Alsalaami did not need an interpreter to meaningfully participate in the defense, and moreover using one could adversely impact Khalil-Alsalaami's credibility with jurors. Further, Clark testified that he conferred with Khalil-Alsalaami about this issue, and Khalil-Alsalaami expressed no objection to this strategy. The district court found Clark's testimony to be more credible than Khalil-Alsalaami's regarding this fact. Under the applicable standard of review, this evidence is sufficient to establish the reasonableness of trial counsel's investigation.

Having confirmed the district court findings are supported by substantial competent evidence, the question remains whether they support its legal conclusion that trial counsel's performance was objectively reasonable. We conclude they do. The findings establish that Khalil-Alsalaami meaningfully participated in his own defense without using an interpreter, which distinguishes this case from *Calderon*. Additionally, other jurisdictions have concluded that counsel's failure to use the services of an interpreter does not constitute deficient performance where the evidence suggested defendant could understand English. See *Gonzalez v. United States*, 33 F.3d 1047, 1051 (9th Cir. 1994) (holding that counsel's failure to use an interpreter at trial did not constitute ineffective assistance when the record supported counsel's belief that the defendant could understand English); *Saleh v. U.S. Dept. of Justice*, 962 F.2d 234, 241 (2d Cir. 1992) (concluding counsel was not ineffective for failing to request an interpreter where alien said he understood English and "testified extensively in English"); *Kuot v. Perry*, No. 20-5209, 2020 WL 5000060, at *2 (6th Cir. 2020) (unpublished opinion) ("Given the considerable evidence showing that Kuot could understand and communicate in English, Kuot has not shown that counsel performed deficiently by failing to secure an interpreter."); *United States v. Rubio-Ayala*, 596 Fed. Appx. 594, 595 (10th Cir. 2014) (unpublished opinion) (trial counsel's performance was not deficient in failing to use interpreter for plea hearing where defendant understood and spoke sufficient English to comprehend proceedings).

27

As such, the district judge's findings, backed by substantial competent evidence, support its conclusion that trial counsel's performance was not deficient in failing to use an interpreter because Khalil-Alsalaami understood and spoke sufficient English to participate meaningfully in his defense and trial counsel's decision to proceed to trial without an interpreter was an objectively reasonable trial strategy employed, after consultation with the defendant, to avoid the perception among jurors that Khalil-Alsalaami was using an interpreter to hide behind a non-existent language barrier. See *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). Therefore, we affirm the district judge's ruling on this issue.

*Trial Counsel's Failure to Fully Advise Defendant of His Statutory Right to an Interpreter Did Not Constitute Ineffective Assistance of Counsel*

Khalil-Alsalaami next contends trial counsel provided ineffective assistance by failing "to inform [him] that he had a statutory right to an interpreter."

The record reveals the existence of substantial competent evidence supporting the district court findings that: (1) trial counsel conferred with Khalil-Alsalaami about the decision to proceed without an interpreter; and (2) Khalil-Alsalaami did not object to the strategic decision. However, the record also reveals trial counsel did not advise Khalil-Alsalaami that he had a *statutory right* to use an interpreter at trial. Nor did trial counsel advise Khalil-Alsalaami on the provisions of the interpreter statute, K.S.A. 75-4351, specifically. This raises the question of how Khalil-Alsalaami could have knowingly waived his statutory right to an interpreter if he was never advised about the existence of K.S.A. 75-4351 in the first instance. Thus, we assume, without deciding, trial counsel's failure to fully advise Khalil-Alsalaami of this statutory right constituted deficient performance and proceed to *Strickland*'s prejudice prong.

28

To analyze the prejudice issue, we first look to K.S.A. 75-4351, the statute addressing the appointment of interpreters at trial, which provides:

"A qualified interpreter shall be appointed in the following cases for persons whose primary language is one other than English, or who is a deaf, hard of hearing or speech impaired person: (a) In any grand jury proceeding, when such person is called as a witness;

"(b) in any court proceeding involving such person and such proceeding may result in the confinement of such person or the imposition of a penal sanction against such person;

"(c) in any civil proceeding, whether such person is the plaintiff, defendant or witness in such action;

"(d) in any proceeding before a board, commission, agency, or licensing authority of the state or any of its political subdivisions, when such person is the principal party in interest;

"(e) prior to any attempt to interrogate or take a statement from a person who is arrested for an alleged violation of a criminal law of the state or any city ordinance."

This statute is part of a larger legislative scheme implemented under Chapter 75 (State Departments; Public Officers and Employees), Article 43 (Public Officers and Employees). The statutory scheme creates a process through which public officials provide qualified interpreters for eligible deaf, hard of hearing, speech impaired, and other-than-English speaking persons in various circumstances. K.S.A. 75-4351 addresses the appointment of interpreters for other-than-English speaking persons. Related statutory provisions establish the compensation schedule, qualifications, and legal duties for these interpreters. See K.S.A. 75-4352 to K.S.A. 75-4355. Then, in K.S.A. 75-4355a to K.S.A. 75-4355d, the Legislature created a similar design enabling public officials to appoint qualified interpreters for deaf, hard of hearing, or speech impaired individuals.

29

Khalil-Alsalaami argues the Legislature's use of the term "shall" in K.S.A. 75-4351 makes the appointment of an interpreter at trial compulsory for persons, like him, whose primary language is one other than English. And he contends this compulsory language, coupled with the statute's silence on the issue, reflects the Legislature's intent to foreclose waiver of these statutory rights, or at minimum, to require such waiver only in open court after proper colloquy. Based on this construction, Khalil-Alsalaami contends trial counsel's advisement and waiver under K.S.A. 75-4351 was objectively deficient. Finally, based on this same construction, Khalil-Alsalaami suggests the Legislature, through the interpreter statute, created rights so fundamental to the fairness of proceedings that any violation must be treated akin to structural error, resulting in prejudice per se or otherwise requiring the court to presume prejudice.

Because we assume trial counsel's performance was deficient in advising Khalil-Alsalaami under the statute, we focus our analysis on Khalil-Alsalaami's argument that the interpreter statute requires courts to presume prejudice under *Strickland*. The plain language of K.S.A. 75-4351, read *in pari materia* with other related provisions in the statutory scheme, does not support Khalil-Alsalaami's conclusion. We have long recognized "K.S.A. 75-4351 and the sections that follow it provide the *machinery* for the selection, appointment and compensation of interpreters under various circumstances. They authorize the expenditure of public funds for that purpose." (Emphasis added.) *State v. Zuniga*, 237 Kan. 788, 791, 703 P.2d 805 (1985). The statutory provisions following K.S.A. 75-4351, which establish the compensation, qualifications, and duties of interpreters, support this construction. See *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 919, 349 P.3d 469 (2015) ("[E]ven when various statutory provisions are unambiguous, we may still construe them *in pari materia* with a view of reconciling and bringing the provisions into workable harmony.").

Thus, contrary to the assumptions implicit in Khalil-Alsalaami's argument, K.S.A. 75-4351 does not create any new constitutional protection. Instead, the statute and its related provisions reflect the Legislature's intent to create a process through which public officials can appoint interpreters for eligible persons to ensure the quality of translation does not fall below existing constitutional thresholds. In this respect, the statutory scheme is designed to serve as a means (appointment of qualified interpreters) to an end (giving effect to defendants' right to meaningfully participate when language barriers require an interpreter). Nothing in the plain language of K.S.A. 75-4351 suggests its violation results in prejudice per se.

In other words, K.S.A. 75-4351 does not enable us to bypass the second prong of the *Strickland* test. Ordinarily, to establish prejudice under this standard, a defendant must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Yet the "concept of prejudice is defined in different ways depending on the context in which it appears." *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1911, 198 L. Ed. 2d 420 (2017). *Strickland* cautions that its two-prong test should not be applied as "mechanical rules" that distract from the "ultimate focus" on the "fundamental fairness of the proceeding." *Strickland*, 466 U.S. at 696. This leaves open the possibility that a defendant, in some circumstances, can satisfy the second prong of *Strickland* by showing trial counsel's deficient performance in connection with K.S.A. 75-4351 rendered proceedings fundamentally unfair, even if it did not affect the outcome. Therefore, under the second prong of *Strickland*, we must look to the circumstances of each case to determine whether counsel's deficient performance in connection with the interpreter statute rendered the proceedings fundamentally unfair or otherwise affected the outcome of the verdict. See *United States v. Lulseged*, 688 Fed. Appx. 719, 722-23 (11th Cir. 2017) (unpublished opinion) (The basic inquiry under similar federal interpreter statute is "whether the failure to provide an interpreter made a proceeding fundamentally unfair," and the defendant bears the burden of establishing prejudice.).

Such was the case in *Calderon*. There, the court found the refusal to provide a translator during closing argument deprived defendant of his right to be meaningfully present. And because the court found this error "implicate[d] the basic consideration of fairness," it did not analyze prejudice under the harmless error standard, "even though the error might have had little, if any, likelihood of having changed the result of the trial." *Calderon*, 270 Kan. at 253. In other words, *Calderon* did not presume prejudice based solely on the violation of K.S.A. 75-4351. Rather, it presumed prejudice based on its conclusion that the statutory violation rendered the proceedings fundamentally unfair.

But not every violation of K.S.A. 75-4351 results in a fundamentally unfair trial. See *State v. Engelhardt*, 280 Kan. 113, 124, 119 P.3d 1148 (2005) (application of structural error in *Calderon* "limited . . . to its unique facts"; cases subsequent to *Calderon* have recognized error implicating right to be present does not automatically merit reversal); see also *State v. Salary*, 309 Kan. 479, 487, 437 P.3d 953 (2019) (violation of statutory rights subject to harmless error analysis). In *Calderon*, it was undisputed defendant required an interpreter to understand what was happening at trial. And the nexus between the lack of an interpreter and the fundamental fairness of the proceeding was apparent.

Here, however, trial counsel's performance, at most, prevented Khalil-Alsalaami from exercising his right to an interpreter under K.S.A. 75-4351. But as described in detail above, substantial competent evidence supports the district judge's finding that Khalil-Alsalaami's English proficiency enabled him to proceed to trial and meaningfully participate in his defense without an interpreter. These findings distinguish *Calderon* and its application of structural error or presumed prejudice. They also support the district court's conclusion that trial counsel's performance was not prejudicial under any permissible application of *Strickland*'s second prong—i.e., there is neither a reasonable probability that the outcome of trial would have been different but for trial counsel's

32

failure to fully advise Khalil-Alsalaami of his rights under K.S.A. 75-4351; nor a reasonable probability that this performance rendered the trial proceedings fundamentally unfair. Thus, even assuming trial counsel's advisement and waiver under K.S.A. 75-4351 constitutes deficient performance, it was not prejudicial under *Strickland*. For these reasons, we affirm the district court's ruling.

*Trial Counsel's Decision Not to Challenge the Voluntariness of Khalil-Alsalaami's Confession Did Not Constitute Ineffective Assistance of Counsel*

Before trial, the State filed a *Jackson v. Denno* motion and requested a hearing to determine the admissibility of Khalil-Alsalaami's confession. While the State's motion was pending, Khalil-Alsalaami discharged his former defense attorney and engaged Clark and Platt as trial counsel. After investigating the issue, trial counsel decided not to pursue or continue to litigate a motion to suppress the confession. Khalil-Alsalaami claims this decision constitutes ineffective assistance of counsel.

*Legal Framework for Evaluating the Omitted Motion to Suppress*

Under *Strickland*, Khalil-Alsalaami is required to show that trial counsel's performance was both objectively deficient and there is reasonable probability the deficiency affected the verdict. *State v. Cheatham*, 296 Kan. 417, 431-32, 292 P.3d 318 (2013). But here, Khalil-Alsalaami's theory requires a more particular showing because his claim does not arise from the affirmative acts of trial counsel but, instead, their omission—specifically, their decision not to litigate a motion to suppress Khalil-Alsalaami's confession. This theory invites a counterfactual analysis exploring what might have been if counsel had fully litigated the suppression issue to its conclusion. Thus, to prevail, the defendant must prove the suppression motion was "meritorious," i.e., likely would have been granted. *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) (when failure to litigate a Fourth Amendment claim

33

competently is the principal allegation of ineffectiveness, "*the defendant must also prove that his Fourth Amendment claim is meritorious* and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice" [emphasis added]); see *Knowles v. Mirzayance*, 556 U.S. 111, 127, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009) ("To prevail on his ineffective-assistance claim" petitioner must show "there is a 'reasonable probability' that he would have prevailed on" the omitted defense.); *Grueninger v. Dir., Virginia Dept. of Corrections*, 813 F.3d 517, 525 (4th Cir. 2016) (petitioner required to show that omitted motion to suppress "was meritorious and likely would have been granted" and granting motion would have affected outcome of trial).

This requirement is rooted in *Strickland*'s traditional analysis because the "merit" of an omitted motion to suppress is highly probative of both *Strickland*'s deficient performance and prejudice prongs. If the omitted motion is not meritorious, then trial counsel's failure to litigate the suppression issue cannot be characterized as objectively unreasonable. *Johnston v. Mitchell*, 871 F.3d 52, 60 (1st Cir. 2017) ("Where an ineffectiveness claim is based on counsel's decision not to file a suppression motion, the petitioner must demonstrate that a meritorious claim formed the basis of the proposed motion in order to establish deficient performance."); *Long v. United States*, 847 F.3d 916, 920 (7th Cir. 2017) ("When a petitioner alleges that counsel was ineffective for failing to move to suppress evidence, we require him to 'prove the motion was meritorious.'"); *Anderson v. United States*, 762 F.3d 787, 794 (8th Cir. 2014) (counsel is not ineffective for failing to pursue suppression motion that counsel reasonably believes to be futile). At the same time, if the motion is not meritorious and the challenged evidence would not have been suppressed, then counsel's omission cannot be prejudicial. *Walker v. Medeiros*, 911 F.3d 629, 633 (1st Cir. 2018) ("Because Walker bases his ineffective assistance of counsel claim on his defense counsel's failure to file a motion to suppress the evidence concerning Harrison's out-of-court identification of Walker,

Walker must, in order to show prejudice, at a minimum show that the motion to suppress would have been granted if it had been made.").

Thus, to establish a Sixth Amendment claim of ineffective assistance based on counsel's failure to litigate a motion to suppress evidence, a defendant must show: (1) a suppression motion would have been meritorious; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence. *United States v. Ratliff*, 719 F.3d 422, 423 (5th Cir. 2013); *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006).

Here, Khalil-Alsalaami's challenge focuses on the voluntariness of his statements to detectives and his waiver of *Miranda* rights just before making incriminating statements about having sex with a 13-year-old girl. The law applied to assess the merit of such a motion is well established.

> "Under the Fifth Amendment, statements stemming from custodial interrogation must be excluded unless the State demonstrates it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination. 'The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation.' [Citations omitted.]" *State v. Regelman*, 309 Kan. 52, 59, 430 P.3d 946 (2018).

If a defendant voluntarily waives *Miranda* rights, any subsequent inculpatory statement must still be voluntarily given. See *State v. Mattox*, 280 Kan. 473, 483, 124 P.3d 6 (2005) ("We acknowledge that the judicial determinations of the two issues usually are separate, *i.e.*, one can make a voluntary waiver of his or her *Miranda* rights but still produce an involuntary confession."). And, in determining the voluntariness of both a waiver and statement, we examine several relevant factors under the totality of the circumstances:

35

"[A] trial court looks at the totality of the circumstances surrounding the statement and determines its voluntariness by considering the following nonexclusive list of factors:

"'(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.'" *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013) (voluntariness of confession).

See *State v. Mattox*, 305 Kan. 1015, 1042-43, 390 P.3d 514 (2017) (voluntariness of *Miranda* waiver).

Appellate courts apply a bifurcated standard of review both to a district court's ruling on a K.S.A. 60-1507 motion after an evidentiary hearing and its ruling on a motion to suppress—assessing the factual underpinnings of the decision for substantial competent evidence and the legal conclusions de novo. *Mattox*, 305 Kan. at 1035; *State v. Brown*, 306 Kan. 1145, 1151, 401 P.3d 611 (2017).

*The District Court Findings Are Supported by Substantial Competent Evidence*

Here, the district judge's order on the K.S.A. 60-1507 motion concluded that trial counsel's performance was objectively reasonable because "Clark's decision to not challenge the voluntariness of the defendant's statement was an informed decision based on his professional judgment after a reasonable and thorough investigation." Specifically, the district judge incorporated by reference the State's response on this issue, which included several fact-findings outlining the steps Clark took to investigate the viability of a motion to suppress. Specifically, before ultimately concluding that Khalil-Alsalaami

understood his *Miranda* rights and voluntarily waived them in making his statement to detectives, Clark:

> "• Listened to the statement and viewed the video;
> "• Reviewed the police reports;
> "• Gave the police reports to the defendant;
> "• Discussed with the defendant the circumstances leading up to the statement;
> "• Examined the factors germane to the issue of voluntariness of confessions and waiver of *Miranda* for custodial interrogations; [and]
> "• Weighed the factors for and against voluntariness."

Further, the district judge determined "[a] review of the facts readily demonstrates that the petitioner's statement to Detective Runyan was the product of his free and independent will. Thus, even if Mr. Clark had moved to suppress [Khalil-Alsalaami]'s statement, it would have been unsuccessful." To support this conclusion, the district judge found "[t]he interview of the defendant was relatively short in duration. The conversation was calm and respectful and the detective treated the defendant fairly." Additionally, the district judge found that Khalil-Alsalaami understood his *Miranda* rights, and that Detective Runyan explained "in clear simple language that [Khalil-Alsalaami] did not have to talk."

We conclude the district court findings are supported by substantial competent evidence. As to the findings regarding the reasonableness of trial counsel's investigation, the testimony of Clark and Platt at the evidentiary hearing directly supported the district judge's factual findings on this issue.

As to the findings regarding the merit of the omitted motion (or lack thereof), Clark testified that Khalil-Alsalaami informed him the detectives made no promises or threats. Clark also confirmed that Detective Runyan never suggested to Khalil-Alsalaami that he was not free to leave at any point before confessing to the crime; he was not

37

handcuffed during the interview and there were no guards at the door; and he had his cell phone throughout the interview. During the interview, Clark observed that Detective Runyan never raised his voice; spoke in a conversational tone throughout; was not argumentative; made no promises of leniency; levied no threats against Khalil-Alsalaami; and advised Khalil-Alsalaami of his rights before questioning.

The State also presented evidence that Khalil-Alsalaami understood the subject matter of the interview, including the advisement of rights. As highlighted in the analysis of the previous issue, the State's evidence supported the district judge's finding that Khalil-Alsalaami could effectively communicate in English and participate in his defense without using an interpreter. At the *Jackson v. Denno* hearing, Detective Runyan testified that Khalil-Alsalaami's English was very good. And if Khalil-Alsalaami did not understand a question, Detective Runyan would clarify it. Also, at the jury trial, Khalil-Alsalaami testified that he understood the words being spoken during the interview and was not confused about the subject matter of the questioning.

Further, the interview was recorded by video, and the video was admitted both at trial and the K.S.A. 60-1507 hearing. We believe this recording provides substantial competent evidence supporting the district court findings regarding Khalil-Alsalaami's English proficiency; his understanding of the advisement of rights and other subjects discussed during the interview; and the factors the district court identified as indicative of the voluntariness of Khalil-Alsalaami's waiver and confession. See *United States v. Marrero*, 152 F.3d 1030, 1034 (8th Cir. 1998) ("[T]he district court did not clearly err in finding that defendant could understand English and that he effectively waived his *Miranda* rights"; reasoning that "at all relevant times, defendant spoke in English . . . and that he never asked for an interpreter or indicated difficulty with the English language. Moreover, several law enforcement officers . . . testified about defendant's proficiency in English based upon their observations and conversations with him."); *United States v. Alarcon*, 95 Fed. Appx. 954, 956 (10th Cir. 2004) (unpublished opinion) (acknowledging

evidence presented at the suppression hearing "can support either a finding that [defendant] understood English or one that he did not," and so the issue of defendant's ability to comprehend the English *Miranda* warnings turned on the witnesses' credibility; upholding the district court's finding that defendant "did not understand the *Miranda* warnings" because an appellate court "will not substitute its own opinion of how the evidence should have been weighed for the district court's assessment of the proper weight of the evidence and of the credibility of witnesses"); *United States v. Rodriguez-Mendoza*, No. 88-3036, 1989 WL 37279, at \*1 (9th Cir. 1989) (unpublished opinion) (noting the informant and DEA agent testified they had negotiated with defendant in English with no difficulty, and defendant was informed of his *Miranda* rights in English and indicated in English that he understood those rights; holding the record was "more than sufficient to support the district court's determination that [defendant] possessed sufficient understanding to effectively waive his *Miranda* rights"); cf. *Oum v. Lewis*, No. 98-55276, 1998 WL 898127, at \*1 (9th Cir. 1998) (unpublished opinion) (habeas corpus case; holding the district court did not err by denying defendant's claim that his waiver of *Miranda* rights and subsequent confession were neither knowing nor voluntary because of his lack of English-language proficiency and the absence of an interpreter; reasoning "the record fairly supports the factual finding that Oum understood English"); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (habeas corpus case; "Even though his proficiency in the English language may have been limited, it did not prevent him from making a knowing and intelligent waiver of his constitutional rights. Campaneria's native tongue is Spanish. Nonetheless, the record, and in particular the transcript of the recorded interview, reveals that, although he spoke in broken English with an accent and occasionally lapsed into Spanish, his command of English was sufficient for him to have understood the *Miranda* warnings given to him.").

Khalil-Alsalaami did offer conflicting evidence regarding his English proficiency and comprehension of the subject matter during the interview. However, the district judge weighed the evidence and resolved the conflicting testimony in favor of the State. Even

so, the Court of Appeals held the district court findings were not supported by substantial competent evidence. *Khalil-Alsalaami*, 54 Kan. App. 2d at 245. In reaching this holding, the panel either failed to acknowledge the substantial competent evidence summarized above or reweighed and resolved conflicts in the evidence, or both. Either way, the holding is erroneous. *Bellamy*, 285 Kan. at 353 (appellate courts cannot disregard substantial competent evidence, reweigh evidence, or resolve conflicting testimony on review).

*The Findings of Fact Support the District Court's Legal Conclusion*

Having held the district court findings are supported by substantial competent evidence, we next determine whether these findings lend adequate support for its legal conclusion—that Khalil-Alsalaami failed to establish that the omitted motion was meritorious, i.e., likely would have been granted, and that there is no reasonable probability the omission resulted in actual prejudice.

Khalil-Alsalaami challenges the validity of the district judge's legal conclusion. He claims that if trial counsel had moved to suppress, then the district court would have found his statement inadmissible at trial under the well-established voluntariness factors—(1) defendant's mental condition; (2) the manner and duration of the interview; (3) defendant's ability to communicate with the outside world; (4) defendant's age, intellect, and background; (5) the officers' fairness in conducting the interview; and (6) defendant's fluency with the English language. *State v. Brown*, 305 Kan. 674, 684, 387 P.3d 835 (2017).

Primarily, Khalil-Alsalaami focuses on the sixth factor—defendant's fluency with the English language. Yet, as established above, the district judge found Khalil-Alsalaami was proficient in English and understood the subject matter of the interview, including the advisement of rights. And these findings are supported by substantial competent

40

evidence. Our court has long acknowledged that district court findings that are supported by substantial competent evidence must be accepted as true for purposes of review. *Wilkinson v. Cummings*, 194 Kan. 609, 611, 400 P.2d 729 (1965). Obviously, the district judge's finding that Khalil-Alsalaami was proficient in English supports the district court's voluntariness conclusion under the sixth factor.

Khalil-Alsalaami also argues the fourth factor (age, intellect, and background) weighs in favor of suppression because in Iraq police have used violence to force confessions from suspects. While Khalil-Alsalaami testified to this cultural knowledge or background, none of the evidence offered at the K.S.A. 60-1507 hearing establishes how it influenced his decision to communicate with detectives on this occasion. It is speculative to conclude from this testimony alone that Khalil-Alsalaami's knowledge of police violence in Iraq unduly pressured him to make a confession to Riley County police detectives. One could equally assert these detectives created a non-coercive environment that contrasted so significantly with Khalil-Alsalaami's impressions of Iraqi police that his cultural knowledge or background had no effect on his decision to waive his rights and provide a statement. Also, other substantial competent evidence from the hearing suggests defendant's age, intellect, and background weighed in favor of the district court's conclusion that Khalil-Alsalaami's statement was voluntary.

Finally, Khalil-Alsalaami suggests the fifth factor (officers' fairness in conducting the interview) weighs in favor of suppression because Detective Runyan used a "minimization technique" to induce his confession to anal and oral sex with a 13-year-old girl. A minimization technique involves "presenting the suspect with a *theme* that reduces the import of the crime. Themes usually convey the interrogator's opinion that the crime was not so serious, that the victim deserved his fate, or that anyone else would have acted in the same way." *United States v. Monroe*, 264 F. Supp. 3d 376, 391 (D.R.I. 2017).

41

However, Detective Runyan did not minimize the offense of aggravated criminal sodomy during the interview. He did not sympathize with Khalil-Alsalaami's circumstances, blame the victim or others at the party, or underplay the gravity of this offense. Granted, Detective Runyan did not share the victim's age (a fact relevant to the crime of aggravated criminal sodomy) until latter portions of the interview and focused his initial inquiries on whether the encounter was consensual. This may have been an intentional strategy, but the method is more accurately described as subject matter avoidance, rather than minimization. Moreover, other evidence reflected the fairness of the interview methods. Detectives did not confront Khalil-Alsalaami with false evidence or contrived investigative findings, threaten Khalil-Alsalaami if he did not cooperate, or promise leniency if he did.

In short, the State offered substantial competent evidence supporting the district judge's voluntariness findings. While the parties offered conflicting evidence on three relevant factors, the district court resolved the conflict by adopting the State's evidence in its consideration of the totality of the circumstances. Given our deferential standard of review, we are bound by the findings made by the district judge. These findings, in turn, support the conclusion that Khalil-Alsalaami's waiver and statement were knowing and voluntary under the totality of the circumstances. This conclusion forecloses Khalil-Alsalaami's claim of ineffective assistance of counsel because he cannot establish that a motion to suppress likely would have been granted, i.e., was meritorious, and that there is a reasonable probability trial counsel's omission resulted in actual prejudice.

Further, the district court findings also support its conclusion that trial counsel's performance was objectively reasonable. At the time trial counsel decided not to litigate the suppression issue, ample authority supported their assessment that a motion to suppress would not be meritorious. First, prevailing Kansas authority indicated the failure to use an interpreter for law enforcement interviews did not render a waiver or statement involuntary where defendant could understand English. See *State v. Pham*, 281 Kan.

1227, 1243, 136 P.3d 919 (2006) (statement voluntary even though English not first language and no interpreter was provided, where defendant was a long-term resident, the video of recording demonstrated comprehension, and defendant declined interpreter); *State v. Nguyen*, 251 Kan. 69, 78, 833 P.2d 937 (1992) (statements freely, voluntarily given even though English was not first language; tape and transcript showed interrogating officers asked open-ended questions and last part of tape showed "marked improvement" in defendant's English ability when it appeared he decided to comply); *State v. Garcia*, 243 Kan. 662, 674-75, 763 P.2d 585 (1988) (statement voluntary even though English was second language; officers testified they had no difficulty communicating with defendant and totality of circumstances weighed in favor of voluntariness), *disapproved of on other grounds by State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992); *Zuniga*, 237 Kan. at 791-92 ("The purpose behind K.S.A. 75-4351[e] is to ensure that there is clear communication between one who is in custody and the officers who are questioning him. The statute does not state a rule of evidence. Whether or not an interpreter is appointed and is present at the taking of the statement, the trial court must still determine whether an in-custody statement was freely, voluntarily and knowingly given, with knowledge of the *Miranda* rights. That determination must be based upon the totality of the circumstances.").

Additionally, even if Detective Runyan's interview technique could be characterized properly as "minimization," no Kansas appellate decision had found this technique alone sufficient to render a defendant's confession involuntary, and other persuasive authority at that time made clear this method alone was insufficient to warrant suppression. See, e.g., *Monroe*, 264 F. Supp. 3d at 393 (finding no authority to support claim that minimization alone rendered confession involuntary); *Commonwealth v. DiGiambattista*, 442 Mass. 423, 438-39, 813 N.E.2d 516 (2004) (officer's use of the standard interrogation tactic of "minimization," by itself, does not compel the conclusion that a confession is involuntary).

Even so, the Court of Appeals held that trial counsel's performance was deficient because it was not "a foregone conclusion" that a district court would have found the confession to be voluntary and, therefore, a reasonable attorney would have litigated the suppression issue. *Khalil-Alsalaami v. State*, 54 Kan. App. 2d 235, 252-53, 399 P.3d 264 (2017). But this "foregone conclusion" standard is neither the appropriate test under *Strickland* nor consistent with the scope of our review on appeal. By applying the proper legal framework under the controlling standard of review, we confirmed the district judge made findings backed by substantial competent evidence that support its conclusion that Khalil-Alsalaami's confession was knowing and voluntary under the totality of the circumstances. Thus, the merits of the omitted motion to suppress were not so plain that no competent attorney would have doubted its success. For these reasons, we affirm the district court's ruling on this issue. *Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018) ("For such a failure to constitute deficient performance, the meritorious nature of the motion must be so plain that 'no competent attorney would think a motion to suppress would have failed.'").

*Trial Counsel's Investigation and Preparation for Trial Did Not Constitute Ineffective Assistance of Counsel*

Next, Khalil-Alsalaami argues trial counsel's investigation and trial preparation was inadequate. To illustrate, he highlights trial counsel's failure to conduct independent DNA testing and their failure to move for judgment of acquittal.

At the K.S.A. 60-1507 hearing, Clark testified the defense team spent days preparing for trial. They had meetings with Khalil-Alsalaami at the jail to identify witnesses, assess the evidence, and develop trial strategy. Further, Platt testified that he conducted legal research for trial and investigated and prepared the defense witnesses. Clark and Platt also employed the services of an associate attorney to assist in the trial preparation. As to the DNA testing, trial counsel testified they did not pursue independent

44

testing out of concern it would merely confirm the accuracy of the State's testing. Also, their trial strategy was not to challenge these test results. Instead, they attempted to provide an innocent explanation for the results through the DNA transference theory. Finally, Clark testified he did not make a motion for judgment of acquittal because he felt the motion was not meritorious.

The district judge found that trial counsel mounted a sophisticated defense at trial that utilized 11 witnesses. The district judge made other findings consistent with the testimony of trial counsel regarding their preparation and investigation. Based on these findings, the district judge concluded that trial counsel's general investigation and trial preparation efforts were objectively reasonable. The Court of Appeals did not reach this claim on appeal. Even so, it is appropriate to examine the district court's ruling because the State has preserved the cumulative error issue for our review, and any of the K.S.A. 60-1507 claims Khalil-Alsalaami litigated before the district court and preserved for review before the Court of Appeals could be potentially relevant to our review of the cumulative error issue.

We find no error in the district judge's ruling. His findings regarding trial counsel's general investigation and preparation are supported by substantial competent evidence. In turn, these findings lend adequate support for the conclusion that trial counsel's investigation and trial preparation were objectively reasonable. *Flynn v. State*, 281 Kan. 1154, 1164, 136 P.3d 909 (2006) (testimony supporting the scope of counsel's efforts in preparing for trial constituted substantial competent evidence supporting district court's conclusion that counsel's performance was objectively reasonable).

Additionally, Khalil-Alsalaami fails to establish that independent DNA testing would have yielded any evidence beneficial to his defense. See *Haddock v. State*, 282 Kan. 475, 514, 146 P.3d 187 (2006) (finding counsel's decision not to conduct further DNA testing reasonable where such testing may have confirmed that allele was not

45

present, thereby undermining defense's strategy for cross-examination). Finally, Khalil-Alsalaami fails to establish that a motion for judgment of acquittal would have been meritorious, and the totality of the evidence presented by the State at trial supports the opposite conclusion. For these reasons, we affirm the district court's ruling on this issue.

*The Stipulation to the Voluntariness of Khalil-Alsalaami's Confession Did Not Constitute Ineffective Assistance of Counsel*

Moving on to the ineffective assistance claims related to trial counsel's performance at or during trial, we first consider Khalil-Alsalaami's argument that he received ineffective assistance when trial counsel stipulated to the voluntariness of his confession, memorialized that stipulation in a journal entry, and failed to object to the admission of the journal entry at trial.

The district court concluded that trial counsel's performance was not deficient and, alternatively, not prejudicial. The former conclusion is not supported by the district court's findings of fact. The district judge reasoned that "[i]t was not objectively unreasonable for Mr. Clark not to object" to the stipulation because the defense strategy at trial was to demonstrate that Khalil-Alsalaami was tricked into confessing falsely, not to contest the voluntariness of the confession. But framing the issue as a choice not to object, rather than a choice not to stipulate in the first place, misses the mark.

Granted, there is a distinction between the admissibility of a confession (a question for the court) and its reliability (a question for the jury). *Crane v. Kentucky*, 476 U.S. 683, 688, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (while a trial court has the duty to determine whether a confession is voluntary, a jury has the duty to assess its reliability). And we recognize the defense strategy here was to challenge only the reliability of the confession and forego a challenge to its admissibility through a motion to suppress. But trial counsel could have accomplished this objective by simply not

46

pursuing a suppression motion—there was no need to take the additional step of stipulating to the voluntariness of the confession and memorializing it in a journal entry. The defense team obtained no tangible benefit from entering the stipulation or foregoing objection to its admission at trial.

The district judge also found "the voluntariness of the statement 'was not an issue in this case.'" But this finding fails to recognize the voluntariness issue overlapped substantially with the defense's strategy to challenge the reliability of the confession. The defense challenged its reliability by arguing Khalil-Alsalaami was tricked into falsely confessing due to Detective Runyan's purported use of a minimization technique during questioning. This false confession theory is premised on the assumption that the detective's methods were deceptive. In this respect, there is a logical inconsistency between the stipulation/journal entry (which confirms the confession was the result of a knowing and voluntary act) and the defense's theory (which suggests the confession is the product of chicanery). Thus, we cannot agree that the stipulation and lack of objection to the journal entry was the result of reasoned strategy and investigation. Even Clark conceded the problematic issues the stipulation and journal entry created for the false confession theory at trial. We concur with the Court of Appeals and hold the district judge erred in concluding that trial counsel's performance was objectively reasonable.

Therefore, we proceed to the second prong of *Strickland* and consider whether the deficient performance was prejudicial. The Court of Appeals concluded the deficient performance was prejudicial because Khalil-Alsalaami's confession was one of the State's "pillars of the trial," and the prosecutor introduced the stipulation and referenced it during closing argument to bolster the confession. *Khalil-Alsalaami*, 54 Kan. App. 2d at 254. However, this conclusion fails to consider the effect of the stipulation and journal entry on the outcome of the proceedings in light of the *entire* record. *Watson v. Marshall*, 784 F.2d 722, 726 (6th Cir. 1985) ("In analyzing prejudicial effect under *Strickland*, it is necessary to examine the record in its entirety.").

At trial, the State introduced evidence substantially undermining Khalil-Alsalaami's "false confession" theory. On cross-examination, Khalil-Alsalaami testified to the noncoercive environment in which detectives conducted their interview, and he confirmed they made no threats or promises. Khalil-Alsalaami said he understood the dialogue and was not confused about the subject matter during the interview. When he did not understand a term, like the word "consensual," Detective Runyan clarified its meaning. Further, the recording of the interview was played to jurors at trial, and they could have reasonably concluded from this evidence alone that Khalil-Alsalaami's confession was a genuine account of the events that had transpired on the night of the party, not the unreliable product of trickery he recanted at trial.

The State also produced substantial evidence of Khalil-Alsalaami's guilt apart from the confession. The victim testified to facts supporting the elements of the crimes of conviction. Her testimony was corroborated by two other witnesses who attended the party that night and the opinion testimony of the SANE nurse. And the results of the DNA testing confirmed the seminal fluid found on the shorts C.J. wore on the night of the assault contained a mixture that matched the known DNA profiles of C.J. and Khalil-Alsalaami.

Viewing the totality of the evidence before the jury, we hold that the district court findings, backed by substantial competent evidence, lend adequate support to its legal conclusion that trial counsel's performance in connection with the stipulation and its admission at trial was not prejudicial under the second prong of *Strickland*. For these reasons, we affirm the district court ruling on this issue.

*Trial Counsel's Failure to Object to the State's Closing Did Not Constitute Ineffective Assistance of Counsel*

Khalil-Alsalaami claims trial counsel were ineffective because they failed to object to the State's misstatements of the DNA evidence. During the initial closing argument, the prosecutor stated: "But at the end of the day you have two—there was a mixed D.N.A. and you have two people contributing that mixed D.N.A.—C.J. and the defendant. There wasn't three people contributing to that D.N.A. sample, there was two."

The prosecutor's remark misstated the evidence because the forensic biologist determined the DNA was actually "consistent with being a mixture of DNA from at least 2 individuals." This meant there may have been other possible contributors to the DNA besides C.J. and Khalil-Alsalaami. This fact was relevant to Khalil-Alsalaami's DNA transference defense.

Khalil-Alsalaami argues trial counsel should have also objected during the rebuttal portion of the State's closing, when the prosecutor applied the same misstatement of the DNA evidence to his transference theory:

> "If she got seminal fluid on the inside of her shorts from the defendant having sex in his bed with [J.B.] . . . why wasn't [J.B.'s] D.N.A. mixed in there? There was no unknown D.N.A. in the mix. It was the defendant's seminal—defendant's D.N.A. fraction 2 and one of the fraction 1 was a mixture of two people, not three people. Not the defendant, C.J., and an unknown. Two people: The defendant and C.J."

Khalil-Alsalaami argues trial counsel's failure to object prejudicially undermined his DNA transference theory.

49

Under *Strickland*'s first prong, the district judge ruled that the failure to object to the prosecutor's misstatements of the evidence constituted deficient performance. The Court of Appeals affirmed this ruling. *Khalil-Alsalaami*, 54 Kan. App. 2d at 260. We reach the same conclusion. The prosecutor's comments during the initial portion of closing clearly misstated the expert witness' testimony at trial. The prosecutor then relied on the same misstatement of evidence in the rebuttal portion of closing argument to challenge Khalil-Alsalaami's transference theory directly. We find no error in the district court's conclusion that trial counsel's performance was deficient.

Under *Strickland*'s second prong, the district judge concluded that Khalil-Alsalaami failed to establish prejudice under the totality of the evidence. The Court of Appeals, however, could not "conclude that this error was harmless based on Clark's defense strategy." *Khalil-Alsalaami*, 54 Kan. App. 2d at 260. The panel reversed the district court, reasoning the deficient performance allowed the prosecutor to distort evidence in a way that cast doubt on the defense's transference theory. However, the Court of Appeals' prejudice analysis seemingly focuses on how counsel's error affected Khalil-Alsalaami's transference defense only, without considering the impact it had on the outcome of the proceedings in light of the totality of the evidence presented to the jury. When considering all the evidence before the jury and the impact of counsel's performance on the verdict, we find no error in the district court's ruling. *Balbirnie*, 311 Kan. at 900 (in deciding whether reasonable probability exists that outcome would have changed but for counsel's deficient performance, court "'must consider the totality of the evidence before the judge or jury'").

First, Khalil-Alsalaami advanced the transference theory in hopes of explaining away the results of the State's DNA testing. But, even without the DNA evidence, the State presented substantial evidence of Khalil-Alsalaami's guilt. At trial, jurors saw the recorded interview in which Khalil-Alsalaami confessed to engaging in oral and anal sex with C.J. on the night of the party. The verdict suggests jurors found his confession

50

compelling—they convicted Khalil-Alsalaami of the aggravated criminal sodomy counts corresponding to the anal and oral sex he admitted to in the interview with detectives, but they acquitted him on the rape count corresponding to the vaginal rape allegations that Khalil-Alsalaami denied in the interview. The State introduced other evidence corroborating Khalil-Alsalaami's confession. C.J. identified Khalil-Alsalaami in open court and testified that he required her to perform oral, anal, and vaginal sex with him on the night of the party. Also, J.E. and R.E. testified that Khalil-Alsalaami agreed to pay money to have sex with C.J. that night; they observed C.J. and Khalil-Alsalaami enter his bedroom; and thereafter, C.J. told them Khalil-Alsalaami engaged in various sex acts with her.

Further, the transference theory did not dispute the results of the State's DNA testing. The State's testing established the DNA profiles created from the seminal fluid found on the shorts C.J. wore on the night of the assault matched the known DNA profiles of C.J. and Khalil-Alsalaami. The defense's transference theory does not controvert these findings. Instead, it merely offered jurors an alternate theory to explain why Khalil-Alsalaami's seminal fluid/DNA ended up on C.J.'s clothing.

Finally, other trial evidence directly undermined the strength of Khalil-Alsalaami's transference theory. Khalil-Alsalaami's mistress testified that when she and Khalil-Alsalaami had sex on his bed before the party, Khalil-Alsalaami wore a condom and left the room with that condom on—establishing that he did not ejaculate on his bed. Jurors could conclude from this testimony that Khalil-Alsalaami's confession to the sex acts with C.J. (rather than DNA transference) provided the most likely explanation as to how Khalil-Alsalaami's seminal fluid/DNA was found on her clothing.

Together, this evidence supports the district court findings and conclusion that Khalil-Alsalaami failed to show a reasonable probability, based on the totality of the evidence before the jury, that the result of the proceeding would have been different but

for trial counsel's failure to object to the prosecutor's misstatements of the DNA evidence during closing argument. Our confidence in this holding is bolstered by the jury instructions, which advised jurors their verdict must be based entirely on the evidence, notwithstanding "whatever counsel on either side may say in argument." See *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 (2011) ("We generally presume jurors follow the instructions given them in the district court."). Therefore, we affirm the district court's ruling on this issue.

*Trial Counsel's Failure to Object to Nall's Opinion Testimony Did Not Constitute Ineffective Assistance of Counsel*

Next, Khalil-Alsalaami argues trial counsel were ineffective because they did not object to portions of Nall's expert opinion testimony. Nall was a nurse with specialized education, training, and experience related to the methods of conducting sexual assault examinations and interpreting clinical findings from them. The State elicited the opinion testimony in question during a brief exchange on direct examination:

"Q.    Okay. What were your findings during C.J. 's sexual assault examination?
"A.    That there was no obvious injuries.
"Q.    Okay. Based on your training and experience is a lack of obvious injury consistent with a sexual assault?
"A.    Yes.
"Q.    And why is that?
"A.    The majority of sexual assault don't have any injuries."

Khalil-Alsalaami claims this testimony was inadmissible under K.S.A. 60-456.

This expert testimony was admissible, provided the opinion was helpful to the jury, the witness was qualified as an expert by "knowledge, skill, experience or training," and the opinion proffered was reliable. K.S.A. 60-456. Logically, expert opinion

52

testimony on subject matter beyond the witness' qualification is inadmissible. *State v. Tully*, 293 Kan. 176, 179, 262 P.3d 314 (2011) (expert opinion beyond the witness' qualifications invaded province of the jury).

Khalil-Alsalaami argues Nall's testimony was objectionable under *Tully*. There, the State elicited similar expert opinion testimony from an emergency room physician who examined the victim. The physician observed no signs of trauma or physical injury but testified this was not inconsistent with rape. The physician explained, "'[M]y understanding is that rape is also kind of a legal term,'" so a perpetrator "'could penetrate the vagina and there would be no physical findings and . . . yet a rape could have occurred.'" 293 Kan. at 202. *Tully* held the district court abused its discretion by admitting the testimony over defense counsel's objection, reasoning:

> "[T]here is a distinction between evidence of physical or mental trauma and evidence establishing rape. While Dr. Hofman was not asked to state an opinion as to whether A.C. had been raped, she was asked to state an opinion as to whether the lack of traumatic injury was counter to a finding of rape. This conclusion requires application of the law— the legal elements of rape—and there is no showing that Dr. Hofman was qualified to know those elements." 293 Kan. at 204-05.

Khalil-Alsalaami claims Nall's opinion likewise required legal expertise beyond her qualifications, rendering the testimony objectionable under K.S.A. 60-456.

The district judge concluded that trial counsel's failure to object to this testimony was objectively reasonable. It found the opinion testimony proper because "Nall was simply testifying to what she observed in the physical exam," and her findings were "consistent with the version of event's [*sic*] C.J. reported." Alternatively, the district judge ruled this performance was not prejudicial because consent was not at issue, and Khalil-Alsalaami confessed to detectives that he had anal sex with C.J. However, the Court of Appeals, relying on *Tully*, found the testimony was objectionable because Nall's opinion

53

was founded on legal expertise beyond the scope of her qualification. *Khalil-Alsalaami*, 54 Kan. App. 2d at 254-55. Thus, it concluded that trial counsel's failure to object constituted defective performance—albeit nonprejudicial. 54 Kan. App. 2d at 255.

However, the opinion in *Tully* was issued in September 2011, several months *after* the conclusion of Khalil-Alsalaami's trial. While *Tully* relied on earlier caselaw to support its holding, specifically *State v. Bressman*, 236 Kan. 296, 689 P.2d 901 (1984), that authority did not forecast the holding in *Tully*. In *Bressman*, an emergency physician opined that the victim had been raped. *Bressman* held the physician's opinion was based on a psychiatric examination and diagnosis, rather than a physical examination, and the record did not establish the physician's qualifications in the field of psychiatry. *Bressman* did not hold that the physician's opinion was improper because it required legal expertise beyond his qualification.

Moreover, before *Tully*, Kansas appellate courts had held that qualified healthcare professionals could testify to whether injuries observed during examination were consistent with rape. See *State v. Humphrey*, 30 Kan. App. 2d 16, 23-24, 36 P.3d 844 (2001); see also *State v. Gay*, No. 107,433, 2013 WL 517828, at *7 (Kan. App. 2013) (unpublished opinion) (district court did not abuse discretion in determining that nurse's training and experience qualified her to give expert testimony at June 2011 trial "about the clinical findings she made in examining [the victim] and whether what she saw was 'consistent with' sexual assault"). In fact, the Court of Appeals' decision in *Tully* reached the same conclusion. It relied on *Humphrey* to distinguish *Bressman* and held the physician's testimony was admissible under K.S.A. 60-456. *State v. Tully*, No. 92,764, 2007 WL 1109309, at *7-8 (Kan. App. 2007) (unpublished opinion), *rev'd* 293 Kan. 176, 262 P.3d 314 (2011).

Thus, at the time of Khalil-Alsalaami's trial, a reasonable attorney would have known from *Bressman* that an expert's opinion in sexual assault cases must be reasonably grounded in their field of clinical or medical expertise. But based on *Humphrey*, et al., a reasonable attorney would have also believed healthcare professionals with specialized knowledge in sexual assault examinations were qualified to opine whether clinical findings were consistent with sexual assault and such testimony was admissible under K.S.A. 60-456.

Nall's testimony was consistent with the type of opinion testimony appellate courts had deemed admissible at the time of Khalil-Alsalaami's trial. See *Kimmelman*, 477 U.S. at 384 (The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error.). Khalil-Alsalaami identifies no authority to the contrary. Nor does he make any showing to suggest trial counsel should have foreseen the outcome in *Tully*, particularly when the Court of Appeals panel in that very case did not.

We hold the district court findings support its conclusion that trial counsel's failure to object to Nall's testimony was objectively reasonable because *Tully* had not been decided at the time of the alleged error; Nall's testimony was consistent with other opinion testimony deemed admissible by Kansas appellate courts at that time; and Khalil-Alsalaami made no showing that trial counsel should have anticipated a favorable change in the law. See *State v. Shives*, No. 108,773, 2015 WL 8588828, at *13 (Kan. App. 2015) (unpublished opinion) (concluding that trial counsel's performance objectively reasonable despite failure to object to nurse's opinion that lack of observable injury was consistent with rape where trial occurred prior to *Tully* opinion, and at the time of trial nurse's testimony was not objectionable). For these reasons, we affirm the trial court's ruling on this issue.

*Trial Counsel's Failure to Object to Questions About Khalil-Alsalaami's Post-arrest Silence and Allegedly Irrelevant Bad Character Evidence Did Not Constitute Ineffective Assistance of Counsel*

Khalil-Alsalaami next argues trial counsel were ineffective for not objecting quickly enough to questions invading his right to remain silent and other questions purportedly introducing irrelevant bad character evidence.

> *The Timing of Trial Counsel's Objection to Cross-examination Implicating Post-arrest Silence Did Not Constitute Ineffective Assistance of Counsel*

On cross-examination, the prosecutor questioned Khalil-Alsalaami about the discrepancy between his confession to aggravated criminal sodomy and his trial testimony denying this conduct. The prosecutor continued to ask a series of questions about whether Khalil-Alsalaami had ever told others, including law enforcement, the version of events he testified to at trial. After several questions, defense counsel objected that the "questioning is starting to invade [Khalil-Alsalaami's] right to remain silent." The district court agreed, ending the line of questioning. Even so, Khalil-Alsalaami, relying on *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), argues trial counsel were deficient in failing to object sooner and this deficiency was prejudicial to his right to remain silent.

In *Doyle*, the United States Supreme Court held that a state prosecutor may not "seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." 426 U.S. at 611. The "use of the defendant's post-arrest silence in this manner violates due process." 426 U.S. at 611.

We have applied and analyzed *Doyle* in situations similar to those presented here. For example, in *State v. Hernandez*, 284 Kan. 74, 159 P.3d 950 (2007), we distinguished permissible impeachment from other lines of questioning that improperly implicate a defendant's right to remain silent under *Doyle*. In *Hernandez*, the court found the prosecutor's questions highlighting the inconsistency between defendant's post-*Miranda* statement (where defendant said he did not recognize a third person portrayed in a photograph) and his trial testimony (where he testified he knew who this person was at the time of the interview) were proper because they "may be interpreted as an attempt to impeach the defendant's trial testimony by way of his prior inconsistent statements to the officers." 284 Kan. at 89. However, as the cross-examination continued, the prosecutor began asking why, at any point during the nine years that lapsed between his *Miranda* advisement and the date he was charged with murder, defendant never told law enforcement the version of events he testified to at trial. The implication of this questioning was that defendant should have gone to law enforcement, "if not before he was charged, definitely after he knew he would stand for trial on the offense." 284 Kan. at 92. The questioning no longer highlighted the inconsistencies between defendant's statement and trial testimony. Instead, it focused on defendant's failure to provide exculpatory information to law enforcement after defendant had been arrested and charged for the crime. *Hernandez* held "this final line of questioning by the prosecutor by implication impermissibly infringed upon the defendant's constitutional privilege to remain silent under *Doyle* and [*State v.*] *Mims*[, 220 Kan. 726, 556 P.2d 387 (1976)]." 284 Kan. at 92.

In ruling on Khalil-Alsalaami's K.S.A. 60-1507 motion, the district judge found the State's line of questioning began as proper impeachment but began to encroach on Khalil-Alsalaami's right to remain silent, and "[a]lthough Mr. Clark may have been a little slow in raising his objections to this line of questioning, he did so and the questioning ceased." Thus, the district judge ruled that trial counsel's performance was not deficient. The Court of Appeals also observed that counsel perhaps could have

objected sooner, but under the totality of the circumstances, this delay "did not constitute deficient performance." *Khalil-Alsalaami*, 54 Kan. App. 2d at 257. Khalil-Alsalaami failed to preserve this issue by filing a cross-petition or conditional cross-petition. Even so, we address the lower courts' decisions given their possible relevance to the cumulative error issue, which the State has preserved for our review.

The district judge's findings are supported by the record. After highlighting the discrepancies between Khalil-Alsalaami's statement and trial testimony, the prosecutor continued to ask Khalil-Alsalaami why he failed to tell others after his arrest that he did not have sex with C.J. We concur that this questioning began to cross into subject matter prohibited by *Doyle* and *Hernandez*. The record also confirms trial counsel objected to the questioning, albeit not at the very outset. Thus, the question is not whether the prosecutor's inquiry was improper, but whether trial counsel's objection was timely.

K.S.A. 60-404, which establishes the contemporaneous objection rule, provides a logical gauge for measuring the reasonableness of counsel's performance as it relates to the timing of an objection. The rule requires a specific and "timely interposed objection" that gives "the district court the opportunity to make the ruling contemporaneous with an attempt to introduce evidence at trial." *State v. Ballou*, 310 Kan. 591, 614, 448 P.3d 479 (2019). Thus, an objection that complies with K.S.A. 60-404 allows the trial court to conduct the proceedings without using the tainted evidence and to adequately address attempts to introduce such evidence, thereby possibly avoiding reversal or a new trial. *State v. Fewell*, 286 Kan. 370, 389, 184 P.3d 903 (2008).

Here, trial counsel objected soon after the prosecutor's line of questioning shifted from legitimate impeachment to subject matter that could implicate *Doyle*. The objection was sufficiently contemporaneous, as it enabled the trial judge to end the line of inquiry. These facts support the lower courts' conclusion that trial counsel's objection complied with the requirements of K.S.A. 60-404. This also lends adequate support to the lower

courts' conclusion that trial counsel's performance was not deficient. Given the fine line between permissible and impermissible impeachment under *Doyle* and *Hernandez*, coupled with the tasks and responsibilities attorneys must manage in the midst of trial, we hold that Khalil-Alsalaami failed to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance under the circumstances. See *State v. Butler*, 307 Kan. 831, 853, 416 P.3d 116 (2018) (courts """must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance""").

> *Trial Counsel's Failure to Object to Allegedly Irrelevant Bad Character Evidence Did Not Constitute Ineffective Assistance of Counsel*

During his direct examination at trial, Khalil-Alsalaami introduced several new facts and issues. First, Khalil-Alsalaami suggested he would never pay for sex or have sex with a 13-year-old, in part, because of the stigma and shame attached to these acts in his culture. The prosecutor objected to the relevance of this testimony, but the district court overruled the objection. In developing his "transference" defense to the results of the State's DNA testing, Khalil-Alsalaami also testified that he had an ongoing affair with J.B., a woman who lived in Missouri. She came to stay with Khalil-Alsalaami on the weekend of the party. Khalil-Alsalaami testified the two had sex in his bed shortly before the party started that evening. Khalil-Alsalaami explained that after having sex with J.B., he used his laptop to chat online with his wife in Iraq.

On cross-examination, the prosecutor confirmed Khalil-Alsalaami chatted online with his wife in Iraq, shortly after he had sex with J.B. The prosecutor asked Khalil-Alsalaami if he told his wife about the affair. When Khalil-Alsalaami said "no," the prosecutor asked why, and Khalil-Alsalaami suggested it was not important or relevant. Years later, at the K.S.A. 60-1507 hearing, Clark testified that "in the calm of hindsight, I wish I would have" objected to this questioning on cross-examination. Khalil-Alsalaami

contends the failure to object constitutes ineffective assistance because the prosecutor's questions were designed to elicit irrelevant and improper bad character evidence.

In ruling on the K.S.A. 60-1507 motion, the district judge found Khalil-Alsalaami first introduced the subject matter of his affair with J.B., the online communication with his wife, and the notion of cultural stigma and shame as a deterrent to bad sex acts. The district judge concluded the prosecutor's questions were appropriate because Khalil-Alsalaami had opened the door on direct examination. Therefore, it ruled that trial counsel's failure to object did not constitute deficient performance.

The record supports the district court finding that Khalil-Alsalaami first introduced, during his direct examination, the subject matter the prosecutor explored on cross-examination. Thus, the pivotal question is whether this finding adequately supports the district court's conclusion that the prosecutor's questions were not objectionable and, therefore, trial counsel's performance was not deficient.

"'Kansas law favors the admission of otherwise relevant evidence, and the exclusion of relevant evidence is an extraordinary remedy that should be used sparingly.'" *State v. Ross*, 310 Kan. 216, 224, 445 P.3d 726 (2019). "'Relevant evidence' means evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Kansas law also permits any party "for the purpose of impairing or supporting the credibility of a witness" to "examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility." K.S.A. 60-420. However, evidence of specific instances of a witness' "conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible." K.S.A. 60-422(d).

Khalil-Alsalaami claims the prosecutor's questions (about the affair and whether he had disclosed the relationship to his wife) were calculated to elicit irrelevant evidence of his specific instances of bad character. Had the State been the first to interject these facts into the proceeding, the argument might have more appeal. But Khalil-Alsalaami first introduced these subjects to support his various trial defenses. He introduced testimony about his affair with J.B. and their sexual encounter on the night of the party to support his "transference" defense to the State's DNA evidence. He testified that shortly after having sex with J.B., he communicated online with his wife in Iraq, presumably to establish a timeline of events from the night of the party and to lend credibility to the version of events to which he testified to at trial. And he testified to the deterrent effect of cultural shame and stigma, to bolster his testimony denying the charged conduct. Over the prosecutor's objection, the trial judge properly ruled this testimony was relevant to Khalil-Alsalaami's defense.

Therefore, it is only logical that the prosecutor could inquire about the new information Khalil-Alsalaami had introduced during direct examination. The prosecutor's questions about whether Khalil-Alsalaami disclosed the affair to his wife were reasonably calculated to elicit relevant information about the content of the online communication Khalil-Alsalaami testified to on direct examination. Further, whether Khalil-Alsalaami had concealed the affair from his wife and his motive for doing so was relevant to the veracity of his testimony about the existence of the affair, its duration, and his claim to have had sex with J.B. in his bed on the night of the party. Moreover, the prosecutor's questions about Khalil-Alsalaami's affair tested the veracity of his claim that shame and stigma deterred him from engaging in other bad sex acts shunned in his culture. Khalil-Alsalaami opened the door to this subject matter, and the prosecutor's questions about these topics on cross-examination were relevant and proper. The record undermines Khalil-Alsalaami's assertion that the prosecutor's cross-examination improperly elicited testimony relevant only to specific instances of Khalil-Alsalaami's bad character (i.e., establishing the trait of dishonesty through Khalil-Alsalaami's sexual encounter with J.B.

on the night of the party and/or his failure to disclose the affair to his wife during their online chat).

The Court of Appeals held that trial counsel's failure to object constituted deficient performance, but only because Clark testified at the K.S.A. 60-1507 hearing that, in hindsight, he wished he would have objected to the relevance of the prosecutor's questions. *Khalil-Alsalaami*, 54 Kan. App. 2d at 258. This holding is legally erroneous because it relies on Clark's subjective assessment of his performance as the measure of reasonableness and fails to eliminate the distorting effects of hindsight. See *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007) ("scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight").

The record confirms the prosecutor's questions on cross-examination were reasonably calculated to elicit testimony relevant to Khalil-Alsalaami's defenses. Because these questions were relevant, trial counsel's failure to object did not constitute deficient performance. Therefore, we affirm the district court ruling on this issue.

*Trial Counsel's Alleged Failure to Impeach J.E. About His Plea Deal Did Not Constitute Ineffective Assistance of Counsel*

At the jury trial, J.E. testified for the State. He had been charged with rape and solicitation, under an aiding and abetting theory, for his role in C.J.'s sexual assault. On direct examination, he testified that he reached a plea agreement with the State, under which he would not be convicted of rape but a lesser charge, "pretty much soliciting— selling someone for sex." On cross-examination, trial counsel secured admissions from J.E. that the terms of his plea agreement required him to testify against Khalil-Alsalaami and there would be no deal with the State but for this testimony.

62

The State also called J.E.'s defense attorney, Jillian Waesche-Seaton, as a rebuttal witness. She testified that under the plea agreement, J.E. received substantial benefits, including a reduction in the charges to conspiracy to commit rape and two favorable sentencing recommendations, but there was no requirement that he testify against Khalil-Alsalaami at his trial. On cross-examination, however, trial counsel elicited testimony from Waesche-Seaton that individuals, like J.E., no longer have a right to remain silent and can be compelled to testify once they have been sentenced pursuant to a plea agreement.

Khalil-Alsalaami argues trial counsel provided ineffective assistance by failing to adequately impeach J.E. with the plea deal during cross-examination. In denying the K.S.A. 60-1507 motion, the district judge found Clark adequately impeached J.E. and concluded such performance was objectively reasonable. The Court of Appeals affirmed this ruling. *Khalil-Alsalaami*, 54 Kan. App. 2d at 258. Khalil-Alsalaami failed to preserve this issue by filing a cross-petition or conditional cross-petition. Even so, we address the lower courts' decisions given their possible relevance to the cumulative error issue, which the State has preserved for our review.

"[T]he decisions of whether and how to conduct cross-examination . . . are matters of trial strategy," provided defense counsel has made an informed decision. *Wilkins v. State*, 286 Kan. 971, 982, 190 P.3d 957 (2008). More specifically, trial counsel's failure to cross-examine a witness regarding the terms of a plea agreement is not deficient performance where the relevant information comes into evidence through other witnesses. 286 Kan. at 986.

Khalil-Alsalaami believes trial counsel should have done more to impeach J.E. Specifically, Khalil-Alsalaami believes trial counsel should have used the plea agreement to establish that J.E. could have been prosecuted as an adult for rape if he did not testify against Khalil-Alsalaami. He also contends trial counsel should have identified the

potential sentence associated with such a conviction. But the evidence established that J.E. received significant and material benefits, both in terms of his conviction and sentence, under the plea agreement. Further, trial counsel impeached the witness by establishing a nexus between these benefits and J.E.'s testimony against Khalil-Alsalaami —despite testimony from J.E.'s counsel that her client was under no obligation to testify pursuant to the terms of the plea agreement.

We find these facts to be indistinguishable from *Wilkins* and affirm the lower courts' ruling on this issue.

*Appellate Counsel's Failure to Raise the Interpreter Issue on Appeal Did Not Constitute Ineffective Assistance of Counsel*

Khalil-Alsalaami also raises claims of ineffective assistance of his appellate counsel, Clark. We apply the same two-prong *Strickland* test to such claims. Thus, to prevail, a defendant "must show that (1) counsel's performance, based upon the totality of the circumstances, was deficient in that it fell below an objective standard of reasonableness and (2) [defendant] was prejudiced to the extent that there is a reasonable probability that, but for counsel's deficient performance, the appeal would have been successful." *Holmes v. State*, 292 Kan. 271, 274, 252 P.3d 573 (2011).

Khalil-Alsalaami argues appellate counsel provided ineffective assistance by failing to raise the interpreter issue on direct appeal. The outcome of this challenge is controlled by our holding disposing of Khalil-Alsalaami's similar claim of ineffective assistance levied against his trial counsel.

We affirmed the district judge's ruling that trial counsel's decision to proceed to trial without an interpreter was objectively reasonable. And, even assuming trial counsel's performance was deficient in failing to properly advise Khalil-Alsalaami of his rights

64

under K.S.A. 75-4351 or securing an effective waiver of those statutory rights, we held such error was not prejudicial. We cannot fault appellate counsel for failing to raise an issue destined to the same outcome. See *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (appellate counsel not ineffective for failing to raise non-meritorious issues). Thus, we affirm the district court's ruling on this issue.

*Appellate Counsel's Failure to Raise Prosecutorial Error on Direct Appeal Did Not Constitute Ineffective Assistance of Counsel*

Similarly, Khalil-Alsalaami contends appellate counsel was ineffective in failing to raise the issue of prosecutorial error on direct appeal, based on the prosecutor's misstatements of the DNA evidence during closing argument.

In reviewing claims of prosecutorial error on direct appeal, we use a two-step process that analyzes both error and prejudice.

"First, in order to determine error has occurred, we must decide 'whether the act complained of falls outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial.' *State v. Chandler*, 307 Kan. 657, Syl. ¶ 6, 414 P.3d 713 (2018). If error is found, we must then determine whether the error prejudiced the defendant's due process rights to a fair trial. 307 Kan. 657, Syl. ¶ 6. In evaluating prejudice, we adopt the traditional harmlessness inquiry set forth in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Under this inquiry, prosecutorial error is harmless 'if the State can demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict."'" *State v. Hachmeister*, 311 Kan. 504, 513-14, 464 P.3d 947 (2020).

65

Once again, our resolution of the same challenge levied against trial counsel controls the disposition of the issue when applied to the performance of appellate counsel. We held the district court findings supported its conclusion that the prosecutor's misstatements of the DNA evidence did not affect the outcome of the proceedings under the totality of the evidence. For the same reason, appellate counsel could not have demonstrated that prosecutorial error prejudiced Khalil-Alsalaami's due process right to a fair trial—the second component of the legal test applied to claims of prosecutorial error. Appellate counsel's failure to raise the prosecutorial error issue on direct appeal did not fall outside the range of reasonable professional judgment because appellate attorneys are not required to raise issues that are weak, meritless, or would result in only harmless error. *Holmes v. State*, 292 Kan. 271, 280, 252 P.3d 573 (2011) (quoting *Baker v. State*, 243 Kan. 1, Syl. ¶ 5, 755 P .2d 493 [1988]). Thus, we affirm the district court's ruling on this issue.

*Trial Counsel's Performance, Viewed in the Aggregate, Did Not Deprive Khalil-Alsalaami of a Fair Trial*

Finally, Khalil-Alsalaami claims the accumulation of errors by trial counsel deprived him of the right to a fair trial.

When evaluating a claim of cumulative error, we look to the totality of the circumstances to determine if the errors substantially prejudiced the defendant and denied him or her a fair trial. In making this determination, "an appellate court examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence." *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020) (citing *State v. Holt*, 300 Kan. 985, 1007-08, 336 P.3d 312 [2014]). No prejudicial error may be found under this rule if the evidence against the defendant is overwhelming. *Holt*, 300 Kan. at 1007-08.

The district judge denied Khalil-Alsalaami's cumulative error claim, concluding that he had "made no showing that the justice of his convictions was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance." Yet, the Court of Appeals held that the accumulation of the following instances of deficient performance by trial counsel violated Khalil-Alsalaami's right to a fair trial:

> "(1) [H]e failed to request an interpreter for [Khalil-Alsalaami] at trial; (2) he failed to file a motion to suppress [Khalil-Alsalaami's] confession or mount a defense at the *Jackson v. Denno* hearing; (3) he stipulated to the voluntariness of [Khalil-Alsalaami's] confession; (4) he failed to object to improper questioning of Nall; (5) he failed to object to questions meant to highlight [Khalil-Alsalaami's] negative character traits; and (6) he failed to object when the prosecutor misstated evidence during closing arguments."
> *Khalil-Alsalaami*, 54 Kan. App. 2d at 262.

However, as set forth above, we reversed the Court of Appeals' holding that trial counsel's performance was deficient in connection with issues 1, 2, 4, and 5. Therefore, the Court of Appeals erred by including these issues in its cumulative error analysis.

Instead, our analysis identified three possible instances of deficient performance. We assumed, without deciding, that trial counsel's failure to fully advise Khalil-Alsalaami of the statutory right to an interpreter under K.S.A. 75-4351 constituted deficient performance. But we affirmed the district court's conclusion that such error was not prejudicial because Khalil-Alsalaami failed to show a substantial likelihood this error affected the fundamental fairness of the proceedings or that the outcome would have been different but for trial counsel's performance.

We agreed with the Court of Appeals' conclusion that trial counsel's decision to stipulate to the voluntariness of Khalil-Alsalaami's confession constituted deficient performance. However, we held the district court findings, supported by substantial

67

competent evidence, overwhelmingly supported its conclusion that this decision was not prejudicial when considering the totality of the evidence before the jury.

Finally, we affirmed the lower courts' conclusion that trial counsel's failure to object to the prosecutor's misstatement of the DNA evidence during closing argument constituted deficient performance. However, we again affirmed the district judge's conclusion that this error was not prejudicial when considering the evidence presented to the jury in its entirety.

We do not find three instances of deficient, but nonprejudicial, performance to be a shocking number when scrutinizing the decision made by trial counsel throughout their investigation, a three-day trial, and a direct appeal. None of these instances of deficient performance resulted in the exclusion of material evidence or the admission of unlawful, prejudicial evidence. Nor did they limit Khalil-Alsalaami's ability to present any of his defenses at trial. Further, the instances of deficient performance were not connected or interrelated. Trial counsel's failure to specifically advise Khalil-Alsalaami of his rights under the interpreter statute had no effect on any issue or evidence at trial. The admission of the journal entry was relevant only to Khalil-Alsalaami's false confession defense. And the failure to object to the prosecutor's closing argument was relevant only to Khalil-Alsalaami's DNA transference theory. As such, the aggregate impact of these errors is no greater than they appear when analyzed independently—in other words, in this case, the whole is no greater than the sum of its parts. Finally, as highlighted throughout the opinion, viewing the totality of the evidence before the jury, the State presented overwhelming proof of Khalil-Alsalaami's guilt on the crimes of conviction and substantial evidence undermining Khalil-Alsalaami's defenses.

For these reasons, trial counsel's instances of deficient performances did not rise to the level of cumulative error or otherwise deprive Khalil-Alsalaami of his right to a fair trial, and we affirm the district court's ruling on this issue.

Judgment of the Court of Appeals is reversed, and the judgment of the district court is affirmed.

ROSEN, J., not participating.
PATRICK D. MCANANY, Senior Judge, assigned.