IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2022 Session

## JONATHAN GUTIERREZ v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2008-A-505      Cheryl A. Blackburn, Judge**

_____

### No. M2021-00298-CCA-R3-PC

_____

The Petitioner, Jonathan Gutierrez, appeals the Davidson County Criminal Court's denial of his post-conviction petition, seeking relief from his convictions of first degree premeditated murder and four counts of aggravated assault and resulting effective sentence of life plus sixteen years. On appeal, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to file a motion to suppress statements he made in response to a custodial interrogation after he had invoked his right to remain silent and because trial counsel failed to intervene when he made incriminating statements during an interview for a television show. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Duffy Cassidy, Nashville, Tennessee, for the appellant, Jonathan Gutierrez.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan M. King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

In February 2008, the Davidson County Grand Jury indicted two men and the Petitioner, who was seventeen years old, for one count of first degree premeditated murder and four counts of aggravated assault. *State v. Jonathan Gutierrez*, No. M2015-01235-CCA-R3-CD, 2017 WL 2274644, at *1 (Tenn. Crim. App. May 24, 2017), *perm. app.*

*denied*, (Tenn. Sept. 21, 2017). The Petitioner was tried separately from his codefendants in January 2011. *Id.*

The proof at trial showed that the Petitioner was a member of Brown Pride, a Mexican street gang, and that nineteen-year-old Lorenzo Garcia was a member of South 13, a rival gang also known as "'Surenos.'" *See id*. at *1, 5. About 4:00 a.m. on August 26, 2007, Mr. Garcia drove by the Petitioner's house in a white Ford Mustang. *Id.* Mr. Garcia's fifteen-year-old girlfriend was sitting in the front passenger seat, and three teenage girls were sitting in the back seat. *Id.* at *3.

As the Mustang passed the Petitioner's house, one of the girls in the back seat saw the Petitioner outside. *Id.* at *4. The girl knew the Petitioner, called his name, and yelled a disparaging remark to him. *See id.* The Petitioner and three fellow gang members got into a white Ford Escape, and the girl looked back and saw the Escape pull out from the Petitioner' s house. *Id.* at *2, 4. The driver of the Escape caught up to the Mustang, and the Petitioner, who was sitting in the rear passenger seat of the Escape, passed his gun to the front passenger. *Id.* The front passenger fired three or four shots at the Mustang, but none of the bullets hit the car. *Id.* The chase ended up on Interstate 65, and the front passenger passed the gun back to the Petitioner. *Id.* The Petitioner said that "'he had one left'" and fired a final shot at the Mustang as the Escape passed the Mustang's driver's side. *Id.* The bullet struck and killed Mr. Garcia. *See id.*

Detectives spoke with the girls in the Mustang, which led the detectives to the Petitioner. *Id.* at *5. Detective Brad Corcoran of the Metropolitan Nashville Police Department ("MNPD") participated in the Petitioner's arrest on the day of the shooting and asked him where the gun was located. *Id.* at *6. The Petitioner initially said he threw the gun into a river but then told Detective Corcoran that "he had put the gun in the tree line behind his house." *Id.* Detective Corcoran walked behind the Petitioner's house and found two guns and a couple of gun magazines underneath a five-gallon bucket. *Id.* One of the guns was a nine-millimeter semi-automatic pistol. *Id.* Analysis of a bullet jacket recovered from Mr. Garcia's body during his autopsy showed that the bullet jacket was fired through the barrel of the nine-millimeter pistol. *Id.*

On May 13, 2009, the Petitioner gave a video-recorded interview for the "Gangland" television show. *Id.* at *4. The State played portions of the interview for the jury, and this court summarized the interview in its direct appeal opinion of the Petitioner's convictions as follows:

> [T]he [Petitioner], wearing clothing that appeared to be an orange prison jumpsuit, stated that he loved his fellow gang members like brothers[,] and that he hid what he did in the gang from his mother. He said that Brown

Pride "beefed" with Surenos anytime they saw each other and that "I always have my gun on me, any point in time." The [Petitioner] said that Surenos members shot at his house twice and that Brown Pride members retaliated for the shootings.

The interviewer asked the [Petitioner] about the shooting in this case, and the [Petitioner] said he and his friends had just pulled into his driveway when the other car drove by his house. The [Petitioner] stated that the people in the other car "just started disrespecting us, saying all kinds of stuff" and that he did not know who was in the car. The interviewer asked, "What did you do then?" The [Petitioner] answered, "Did what we had to do." He said that he was in a car with three other males and acknowledged that they "chased down" the other car. He stated that the other car "basically waited for us" and that no one in the other car shot at the car he was in. He then stated as follows:

> Everything happened so quick. . . . How it look, like if it was in your position, you get behind me, I'm a gamer and you [in] a different gang. You get behind me. If I come to your house, roll up to you, of course you going to come at me. Me and my homeboys going to stop at a light and wait for you, huh? Soon as I stick my head out, what you going to think? You going to think I'm fixing to shoot you. So things happen.

The [Petitioner] said that he did not know "that guy," meaning Lucio Garcia, and that the females in the car were "hood rats." The interviewer asked if the [Petitioner] had his gun at the time of the incident, and he said no. He acknowledged that he thought the people in the other car were going to harm him.

*Id.* at *4-5.

At the conclusion of the proof, the jury convicted the Petitioner of the first degree premeditated murder of Mr. Garcia and one count of aggravated assault for each girl riding in the Mustang. *Id.* at *7. The trial court sentenced him to life for the murder conviction and four years for each aggravated assault conviction and ordered that he serve the sentences consecutively. *Id.* This court affirmed the Petitioner's convictions and effective sentence of life plus sixteen years. *Id.* at *16.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief, asserting that he received the

ineffective assistance of counsel. Relevant to this appeal, the Petitioner claimed that trial counsel was ineffective because trial counsel did not try to suppress the statements that led to Detective Corcoran's discovery of the nine-millimeter pistol and because trial counsel failed to file a motion to suppress the Gangland interview; stipulated to the State's use of the "highly damaging, self-incriminating" interview; and failed to advise the Petitioner that the State could use the interview at trial. The post-conviction court appointed counsel, and post-conviction counsel filed an amended petition in which the Petitioner maintained that trial counsel was ineffective for failing to file a motion to suppress his statements to Detective Corcoran. The Petitioner also asserted that trial counsel was ineffective for failing to intervene on his behalf during the Gangland interview.

At the evidentiary hearing, trial counsel testified that the Petitioner's family contacted him after the Petitioner's case was transferred to criminal court. Trial counsel had represented the Petitioner and his relatives in other matters, so the Petitioner's family retained trial counsel to represent the Petitioner in this case. Trial counsel said that his first meeting with the Petitioner occurred in court or at the jail across the street from the courthouse and that they talked about the charges. Trial counsel had not seen discovery at that time, so they did not talk about the details of the case. Trial counsel filed a motion for discovery and received discovery from the Petitioner's juvenile court attorney, and trial counsel hired an investigator, Patrick Wells, to assist with the Petitioner's case.

Trial counsel testified that he did not give a copy of the discovery materials to the Petitioner, explaining that it was his practice not to give discovery to a client in jail because he did not want the client discussing the case with other inmates who could use that information against the client. However, Mr. Wells may have shown a copy of discovery to the Petitioner.

Post-conviction counsel showed three "supplement reports" to trial counsel. The reports were written by MNPD Detectives David Achord, Mark Anderson, and Brad Corcoran, all of whom investigated the August 26, 2007 shooting. Trial counsel said that he did not remember seeing the reports previously but that the reports probably were in the discovery materials. According to the reports, the detectives learned from the girls in the Mustang that the Petitioner was involved in the shooting. The detectives went to the Petitioner's house on the morning of the incident, asked if he would go voluntarily to the "south precinct," and transported him to the police department. The Petitioner received *Miranda* warnings and signed a waiver of rights form, and Detectives Achord and Anderson began questioning him while Detective Corcoran "monitored" the interview. When the detectives confronted the Petitioner about an inconsistent statement he had made, the Petitioner invoked his right to remain silent, and the detectives stopped the interview.

According to Detective Corcoran's report, the Petitioner was later "taken to juvenile to be booked." Prior to the Petitioner's being transported, Detective Corcoran asked him to reveal the location of the gun used in the shooting. At first, the Petitioner claimed he threw the gun into a river. However, Detective Corcoran told the Petitioner "that was not true," so the Petitioner "dropped his head and said the weapon was in the tree line in the back yard of his home under a white bucket." About 2:00 p.m., Detective Corcoran went to the Petitioner's house. The detective found a white bucket in the tree line behind the house and found the gun under the bucket. According to Detective Achord's report, he interviewed the Petitioner's mother after the Petitioner's police interview. The Petitioner's mother gave Detective Achord consent to search her residence and signed a consent form. Detectives went to the house and found the firearm under an overturned white bucket in the back yard.

Trial counsel testified that he remembered Detective Corcoran was not present for the first part of the Petitioner's police interview and that Detective Corcoran also may not have been present "towards the end" of the interview. The Petitioner's police interview was video recorded, and trial counsel watched the video as part of trial preparation. Trial counsel said the Petitioner's invocation of his right to remain silent in the supplemental reports was consistent with the video.

Trial counsel testified that the reports were "summaries" and that "I don't ever look at reports as the bible of what happened." Nevertheless, trial counsel acknowledged that Detective Corcoran's report appeared to show that the detective questioned the Petitioner about the firearm after the Petitioner had invoked his right to remain silent. Trial counsel explained that the Petitioner's conversation with Detective Corcoran occurred "later in the day when they decided to charge him" and that the conversation did not "pop up as an issue" for a motion to suppress because the Petitioner "voluntarily" spoke with Detective Corcoran. Trial counsel said that the Petitioner "started saying things about throwing the gun in the river" and that "it was like a consensual conversation at that point." Trial counsel stated, though, that "looking back at it, you, know, now, I guess someone could say hey, maybe that's a suppressible issue." Post-conviction counsel introduced the supplemental reports into evidence.

Trial counsel testified that at some point, producers from the Gangland television show contacted him and asked if the Petitioner "would be willing to sit down and talk to them" about his gang affiliation. Trial counsel asked the Petitioner "if he wanted to do it and if he'd be willing to do it," and the Petitioner said yes. Trial counsel said that he set up "certain ground rules" with the producers prior to the interview and that the interviewer was not supposed to ask the Petitioner anything about the shooting. The producers wanted the Petitioner to answer questions about his upbringing and relatives, and trial counsel and

the Petitioner talked about some of the questions the interviewer was going to ask during the interview.

Trial counsel testified that the interview occurred at the jail and that he was present for the entire interview. After the interview was "supposed to have been over," trial counsel was talking with some of the producers while the interviewer was talking with the Petitioner to get some "out take shots." Trial counsel said that he overheard "something that sounded familiar," that he "keyed back in" to what the Petitioner was saying, and that he realized the interviewer and the Petitioner were "off the path." Trial counsel tried to signal "stop talking, stop talking" to the Petitioner, but the Petitioner could not see him due to the spotlights shining on the Petitioner. Trial counsel told the producers that "we're not supposed to be talking about any of this," so the producers stopped the interview. A law firm later tried to prevent the State from using the outtakes in court, and the situation became "[a] bit of a circus."

Trial counsel acknowledged that according to jail records, he visited the Petitioner only one time. Trial counsel disputed the accuracy of the records, noting that he met with the Petitioner in jail when the Petitioner's family retained him and that he was present for the Petitioner's Gangland interview in jail. Trial counsel said that jail employees may not have logged all of his visits to the Petitioner and that he thought he met with the Petitioner two more times in jail. The State made a forty-year plea offer, and trial counsel conveyed the offer to the Petitioner before the case was set for trial. The Petitioner turned down the offer.

On cross-examination, trial counsel testified that he was licensed to practice law in July 2011 and that at least ninety-five percent of his practice involved criminal defense. In addition to speaking with the Petitioner in jail, trial counsel spoke with the Petitioner when the Petitioner appeared in court. Trial counsel and the Petitioner discussed the State's proof and possible defenses, and Mr. Wells met with the Petitioner several times. Trial counsel told the Petitioner before the Gangland interview not to discuss the facts of his case, and the Petitioner understood that he was not to discuss the shooting. The trial court ruled that the Gangland interview was admissible at trial, so trial counsel requested a continuance to reassess his trial strategy.

The Petitioner testified that the police arrested him on August 26, 2007, and that he had been incarcerated since his arrest. The Petitioner knew trial counsel "personally" at the time of his arrest, so the Petitioner's family retained trial counsel to represent the Petitioner. Their first meeting occurred in court and lasted "[n]o more than five minutes." The Petitioner talked with trial counsel in court "[s]ometimes," but they never discussed the details of the Petitioner's case. Petitioner said trial counsel's "secretary" delivered a copy of the discovery materials to the Petitioner in jail, but the Petitioner and trial counsel

never went over the materials. At first, the Petitioner said he did not remember trial counsel's ever meeting with him in jail. However, the Petitioner subsequently acknowledged that trial counsel met with him in jail the night before trial and that trial counsel was present for the Gangland interview.

The Petitioner testified that he asked trial counsel the night before trial if the State ever made a plea offer. Trial counsel told the Petitioner for the first time about the forty-year offer. The Petitioner said he turned down the offer because "it was a lot of years" and because he "was not ready for it."

The Petitioner testified that a detective from the police department's Gang Unit approached him about a Gangland interview. The producers of the television show wanted to talk with the Petitioner about his life and about his being involved in a gang. The Petitioner told the detective that he did not want to participate in the interview and that he "would not talk" unless his attorney was present. The Petitioner said, "That was the end of it. I walked off."

The Petitioner testified that the detective later approached him again about a Gangland interview. The Petitioner told the detective that he would only participate if his attorney was present. On the day of the interview, the Petitioner asked trial counsel if it was "right for [him] to do the interview." Trial counsel "was like yeah" and told the Petitioner to talk about his life and how he grew up. They did not discuss anything else, and trial counsel did not tell the Petitioner what to do if the producers asked about the facts of his case. However, the Gang Unit detective who was present for the interview told the Petitioner not to talk about the shooting, and it was the Petitioner's understanding that the interviewer was not going to ask him about the case.

The Petitioner testified that the Gangland interview occurred in a small room and that trial counsel, the producers, the Gang Unit detective, and a sheriff's officer were present. The room was dark, but the Petitioner could see trial counsel. While the Petitioner was giving the interview, trial counsel was talking with the Gang Unit detective. The interviewer asked the Petitioner about his case. The Petitioner told the interviewer to go to the next question, but the interviewer kept asking about the shooting. The Petitioner did not try to get trial counsel's attention, and trial counsel did not indicate that the Petitioner should stop talking, so the Petitioner gave "a general answer." The Petitioner was eighteen years old at the time of his interview and knew "[z]ero" about the law. Post-conviction counsel asked why he kept answering the interviewer's questions about the shooting, and the Petitioner stated, "Well, I felt like, I looked over at [trial counsel], he ain't saying nothing, so I felt like it didn't matter[.]" The Petitioner later learned the State wanted to use his interview at trial, and the Petitioner felt "[b]etrayed" because he trusted trial counsel. The Petitioner said that he and trial counsel never discussed the defense's theory

- 7 -

of the case or trial strategy and that he knew "[n]othing" about his case on the first day of trial.

On cross-examination, the Petitioner initially testified that he spoke with trial counsel's investigator, Mr. Wells, one time. He then acknowledged that he met with Mr. Wells twice. Trial counsel was present for the Gangland interview, but trial counsel never told the Petitioner to stop talking during the interview.

On December 18, 2020, the post-conviction court entered an order denying the petition. Regarding the Petitioner's claim that trial counsel was ineffective for failing to file a motion to suppress his statements about the location of the firearm, the post-conviction court concluded that "given that the police knew the incident began at the Gutierrez residence and [that the Petitioner's mother] gave consent to search her vehicle and residence, the police would have inevitably discovered the firearm, which was in the backyard covered by a bucket." The post-conviction court also concluded that the Petitioner failed to show deficient performance because he was supposed to "incorporate a motion to suppress within the proof presented at the post-conviction hearing" and that he failed to show prejudice because the evidence against him was "substantial." As to the Petitioner's Gangland interview, the post-conviction court concluded that even if trial counsel was deficient for allowing the Petitioner to take part in the interview, the Petitioner failed to demonstrate prejudice because the evidence at trial established that he participated in the shooting. Accordingly, the post-conviction court denied the petition for post-conviction relief. The Petitioner appeals the denial of the petition.

## ANALYSIS

Initially, we note that the Petitioner's brief does not comply with Tennessee Rule of Appellate Procedure 27(a)(6), which provides that an appellate brief "shall" contain "[a] statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record." The statement of facts in the Petitioner's brief states,

> The facts stated in the opinion of the Post-Conviction Court in the case *sub judice* are substantially correct. The [Petitioner] will not restate the facts pursuant to Rule 27(a)(6), Tennessee Rules of Appellate Procedure. A copy of opinion of the Post-Conviction Court is attached hereto and incorporated herein by reference.

We remind post-conviction counsel that a statement of facts and citations to the record are helpful to this court in discerning the issues. Although post-conviction counsel deliberately disregarded Rule 27, we will address the Petitioner's ineffective assistance of counsel claims.

The Petitioner contends that trial counsel was ineffective for failing to file a motion to suppress the statements he made to Detective Corcoran about the location of the firearm. He asserts that the suppression motion was "plainly meritorious" because he made the statements during a custodial interrogation after he had invoked his right to remain silent. The Petitioner further asserts that the post-conviction court erred by relying on the inevitable discovery doctrine to deny his petition for post-conviction relief because the proof does not show that Detective Corcoran would have discovered the weapon without the Petitioner's statements. The State argues that the post-conviction court properly denied the petition. We agree with the State.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Id.* However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

Ordinarily, the prejudice prong of the *Strickland* test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Recently, though, our supreme court determined that when a petitioner raises an ineffective assistance of counsel claim based on counsel's failure to file a motion to suppress, *Kimmelman v. Morrison*, 477 U.S. 365 (1986), defines the appropriate standard for prejudice. *Tommie Phillips v. State*, --- S.W.3d ---, No. W2019-01927-SC-R11, 2022 WL 2092796, at *8 (Tenn. June 10, 2022). Specifically, to demonstrate prejudice under *Kimmelman*, a petitioner must show a meritorious suppression claim and a reasonable probability that the outcome of the proceedings would have been different if the evidence at issue had been excluded. *Id.* Accordingly, in such cases, Tennessee courts are to utilize the following three-prong test for determining whether the petitioner is entitled to post-conviction relief:

> "(1) a suppression motion would have been meritorious; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence."

*Id.* at *9 (Tenn. June 10, 2022) (quoting *Khalil-Alsalaami v. State*, 486 P.3d 1216, 1239 (Kan. 2021)). Under the *Kimmelman* test, "[i]t remains the petitioner's burden to prove the factual allegations supporting all claims in the petition by clear and convincing evidence." *Id.* at *10 (citing Tenn. Code Ann. § 40-30-110(f)). Moreover, as with the *Strickland* test, the petitioner's failure to prove even one of the prongs justifies denial of relief on the ineffective assistance of counsel claim. *Id.*

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide protection against compulsory self-incrimination. To this end, "'once warnings have been given, . . . if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At that point, he has shown that he intends to exercise his Fifth Amendment privilege.'" *State v. Crump*, 834 S.W.2d 265, 269 (Tenn. 1992) (quoting *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)). "Once a person in custody indicates 'in any manner' that he wishes to remain silent, questioning must cease unless the person initiates further conversation with the authorities." *State v. Steven Jeffrey Pike*, No. E2015-02357-CCA-R3-CD, 2017 WL 363283, at *19 (Tenn. Crim. App. Jan. 25, 2017) (citing *Miranda*, 384 U.S. at 474 and *Crump*, 834 S.W.2d at 269).

This court has stated that "[i]n most circumstances, . . . advocacy demands that an attorney attempt to suppress any incriminating evidence if arguable grounds exist." *Robert C. Bellafant v. State*, No. 01C01-9705-CC-00183, 1998 WL 242449, at *6 (Tenn. Crim. App. May 15, 1998). However, in order to prevail on a post-conviction ineffective assistance of counsel claim based on counsel's failure to file a motion to suppress, the petitioner "should incorporate a motion to suppress within the proof presented at the post-conviction hearing." *Tommie Phillips*, --- S.W.3d ---, No. W2019-01927-SC-R11, 2022 WL 2092796, at *8 (quoting *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011)).

As to the Petitioner's claim that trial counsel was ineffective for failing to file a motion to suppress the statements he made to Detective Corcoran about the location of the firearm, the post-conviction court concluded that the Petitioner was not entitled to relief on this issue because the Petitioner's mother consented to a search of her residence; therefore, the police would have discovered the gun even without the Petitioner's statements. The court also concluded that the Petitioner was not entitled to relief because he failed to incorporate a hearing on the motion to suppress into the post-conviction evidentiary hearing. We agree with the post-conviction court that the Petitioner failed to show by clear and convincing evidence that a suppression motion would have been meritorious. The Petitioner introduced three supplemental police reports into evidence at the evidentiary hearing. Trial counsel reviewed the reports during his direct testimony and acknowledged that they appeared to show Detective Corcoran questioned the Petitioner about the location of the murder weapon after the Petitioner's arrest and after the Petitioner had invoked his right to remain silent. Trial counsel said that in hindsight, a motion to suppress may be been meritorious. However, trial counsel also said that supplemental reports were just "summaries," that he did not consider reports to be "the bible" of what occurred in a case, and that he did not file a motion to suppress the Petitioner's statement because the Petitioner "voluntarily" spoke with Detective Corcoran and "started saying things about throwing the gun in the river."

The Petitioner did not call any of the detectives to testify at the evidentiary hearing, and post-conviction counsel did not question the Petitioner about his statements to Detective Corcoran. Therefore, we cannot determine whether Detective Corcoran violated the Petitioner's right to remain silent by asking him about the location of the firearm or whether the Petitioner voluntarily revealed the location of the weapon as claimed by trial counsel. Moreover, the record from the direct appeal of the Petitioner's convictions is silent as to the Petitioner's invocation of his right to remain silent and the circumstances surrounding his subsequent statements about the firearm.[1] Therefore, we conclude that the Petitioner has not shown under *Kimmelman* that he was prejudiced by trial counsel's failure to file a motion to suppress his statements to Detective Corcoran.

Next, the Petitioner contends that trial counsel was ineffective for failing to intervene during his Gangland interview. The post-conviction court concluded that even if trial counsel was deficient for allowing the Petitioner to take part in the interview, the Petitioner failed to demonstrate prejudice because the evidence at trial established that he participated in the shooting. Again, we agree with the post-conviction court. At trial, the Ford Escape's driver, a fellow member of Brown Pride, testified about the Petitioner's involvement in the crimes, including that the Petitioner told him to chase the Mustang and that the Petitioner fired the final shot at the car. *See Jonathan Gutierrez*, 2017 WL 2274644, at * 2. The teenage girl who yelled at the Petitioner as the Mustang passed by his house testified that she knew the Petitioner, that she saw him outside, and that she saw the Escape pull out from his house. *Id.* at *4. Additionally, the murder weapon was recovered from the Petitioner's back yard. *See id.* at *6. We note that the trial transcript shows that the trial court instructed the jury on criminal responsibility. As this court noted in its direct appeal opinion, even if the Petitioner did not fire the shot that killed Mr. Garcia, the evidence established that the Petitioner participated in the chase and the shooting and, therefore, that he was criminally responsible for Mr. Garcia's death. *See id.* at *8. Thus, we conclude that the Petitioner also has not shown under *Strickland* that he was prejudiced by trial counsel's failure to intervene in the Gangland interview.

## CONCLUSION

Based on our review, we affirm the judgment of the post-conviction court.

_____
JOHN W. CAMPBELL SR., JUDGE

---

[1] This court may take judicial notice of the record presented on direct appeal of the Petitioner's convictions, and we choose to do so in this case. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009).